9 F.3d 1067
 62 USLW 2352, 2 A.D. Cases 1470, 3
ADD 444, 4 NDLR P 278
 Elizabeth KINNEY; Glenn Niman; Daniel C. Sullivan; Diane
Fatula; Cassie James; Erik Von Schmetterling; John
Gladstone; Tom Levine; Charles Homiller; Rona Schnall;
Mary Barnes; Ann McLaughlin; Disabled in Action of
Pennsylvania, individually and on behalf of all others
similarly situated.
v.
Howard YERUSALIM, individually, and in his official capacity
as Secretary of the Pennsylvania Department of
Transportation; Alexander Hoskins, individually, and in his
official capacity as Commissioner of the Philadelphia
Streets Department, Alexander Hoskins, Commissioner of the
Philadelphia Streets Department, Appellant.
 No. 93-1168.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 22, 1993.
Decided Nov. 23, 1993.
 
 Judith E. Harris, City Sol., Michael F. Eichert (argued), Office of City Sol., Philadelphia, PA, for appellant.
 George R. Specter, Deputy Sol., Gretchen G. Donaldson, Associate Sol., Terri J. Imbarlina, Asst. City Sol., City of Pittsburgh, Dept. of Law, Pittsburgh, PA, for amicus-appellant City of Pittsburgh.
 Stephen F. Gold (argued), Robin Resnick, Philadelphia, PA, for appellees.
 Thomas K. Gilhool, Frank J. Laski, Public Interest Law Center of Philadelphia, Philadelphia, PA, for amicus-appellees United Cerebral Palsy Associations, Inc.; Adapt; Eastern Paralyzed Veterans of America; Tash: The Ass'n for Persons with Severe Handicaps; Pennsylvania Center for Individual Living.
 James P. Turner, Acting Asst. Atty. Gen., Jessica Dunsay Silver, Marie K. McElderry (argued), U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for amicus-appellee U.S. of America.
 Before: STAPLETON, ROTH and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 ROTH, Circuit Judge:
 
 
 1
 This appeal requires us to determine whether 28 C.F.R. 35.151(e)(1) (1992), issued by the Attorney General pursuant to Section 204 of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. Sec. 12134 (Supp.1991), requires the City of Philadelphia (the "City") to install curb ramps[1] at intersections when it resurfaces city streets. At issue is whether resurfacing constitutes an "alteration" within the scope of the regulation. The district court held that it does and ordered the City to install curb ramps on those portions of city streets for which resurfacing bids had been taken since January 26, 1992, the effective date of the ADA. On appeal, the City challenges the district court's reading of the term "alteration." Alternatively, it suggests that if resurfacing is, indeed, an alteration, it is entitled to raise an "undue burden" defense under 28 C.F.R. 35.150(a)(3) (1992).
 
 
 2
 We agree with the district court's interpretation of the regulation and, consequently, we will affirm. Moreover, we agree that the applicability of the "undue burden" defense has been carefully limited to existing facilities and programs. Thus, that defense is not available in the context of alterations.
 
 I.
 
 3
 Plaintiffs are Disabled in Action, a non-profit organization, and twelve individuals with ambulatory disabilities who live and work in Philadelphia. In their complaint, plaintiffs sought injunctive relief under 42 U.S.C. Sec. 1983 (1988) for alleged violations of the ADA. These allegations were based on the City's practice of installing curb cuts only when work on the city streets otherwise affected the curb or sidewalk or when a complete reconstruction of the street was required.
 
 
 4
 The lack of curb cuts is a primary obstacle to the smooth integration of those with disabilities into the commerce of daily life. Without curb cuts, people with ambulatory disabilities simply cannot navigate the city; activities that are commonplace to those who are fully ambulatory become frustrating and dangerous endeavors. At present, people using wheelchairs must often make the Hobson's choice between travelling in the streets--with cars and buses and trucks and bicycles--and travelling over uncut curbs which, even when possible, may result in the wheelchair becoming stuck or overturning, with injury to both passenger and chair.
 
 
 5
 The City of Philadelphia has some 2,400 miles of streets, roads and highways. These streets typically consist of three components: a sub-base of stone, covered by a concrete base, finished with a layer of asphalt. For routine maintenance--patching, pothole repairs, and limited resurfacing--the City maintains a crew of roughly 300 people. For more extensive work, including most resurfacing, bids are solicited from outside contractors.
 
 
 6
 Resurfacing of the streets is done in a variety of ways, affecting different parts of the street structure. Resurfacing at its simplest is "paving," which consists of placing a new layer of asphalt over the old. In other instances, a more complicated process of "milling" is used to ensure proper drainage or contouring of the road. Milling requires the use of heavy machinery to remove the upper 2 to 3 1/2 inches of asphalt. During an ordinary milling and resurfacing job, cracks in the concrete base may be discovered, and, if so, repaired. The most extensive form of resurfacing is "reconstruction," which involves removal and replacement of both the asphalt and the concrete or stone layers.
 
 
 7
 Whatever the extent of work performed under a contract, the City has certain minimum requirements for resurfacing. Thus, by the City's own specifications, resurfacing requires laying at least 1 1/2 inches of new asphalt, sealing open joints and cracks, and patching depressions of more than one inch. At issue in this appeal are those resurfacings which cover, at a minimum, an entire street from intersection to intersection. Thus, we are not called upon to decide whether minor repairs or maintenance trigger the obligations of accessibility for alterations under the ADA.
 
 
 8
 At present the City does not include the installation of curb cuts in its milling and resurfacing contracts unless the curb is independently intended to be altered by the scope of the contract. Thus, only those contracts calling for alterations to curbs include curb cuts; contracts for alterations limited to the street surface itself do not.
 
 
 9
 Plaintiffs brought this class action against Alexander Hoskins, the Commissioner of the Philadelphia Streets Department, and Howard Yerusalim, the Secretary of the Pennsylvania Department of Transportation ("PennDOT"), to compel the installation of curb cuts on all streets resurfaced since the effective date of the ADA.[2] After the parties filed cross-motions for summary judgement, the district court granted plaintiffs' motion, ordering the City to "install curb ramps or slopes on every City street, at any intersection having curbs or other barriers to access, where bids for resurfacing were let after January 26, 1992." Kinney v. Yerusalim, 812 F.Supp. 547, 553 (E.D.Pa.1993). The City brought a timely appeal.
 
 II.
 
 10
 The district court had jurisdiction over this action pursuant to 28 U.S.C. Sec. 1331 (1988) and 28 U.S.C. Secs. 1343(a)(3) & (4) (1988). Appellate jurisdiction from a final order of the district court is predicated upon 28 U.S.C. Sec. 1291 (1988). The standard of review applicable to a grant of summary judgement is plenary. "On review the appellate court is required to apply the same test the district court should have utilized initially." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This court must decide whether a genuine issue of material fact exists and, if not, whether the moving party is entitled to summary judgement as a matter of law. Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir.1987).
 
 III.
 
 11
 Title II of the ADA prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. Sec. 12132 (Supp.1991), provides:
 
 
 12
 [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
 
 
 13
 Congress' concern with physical barriers is apparent in both the history and the text of the legislation. For example, the findings section of the Act recounts:
 
 
 14
 . . . . .
 
 
 15
 (2) historically, society has tended to isolate and segregate individuals with disabilities ...;
 
 
 16
 (3) discrimination against individuals with disabilities persists in such critical areas as ... transportation ... and access to public services;
 
 
 17
 . . . . .
 
 
 18
 (5) individuals with disabilities continually encounter various forms of discrimination, including ... the discriminatory effects of architectural, transportation and communication barriers....
 
 
 19
 42 U.S.C. Sec. 12101 (Supp.1991). These general concerns led to a particular emphasis on the installation of curb cuts. The House Report for the legislation noted that "[t]he employment, transportation, and public accommodation sections of this Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 367. As such, "under this title, local and state governments are required to provide curb cuts on public streets." Id.
 
 
 20
 The Act itself does not set forth implementing standards, but rather directs the Attorney General to do so. 42 U.S.C. Sec. 12134(a) (Supp.1991). As guidance, Congress directed that the regulations be consistent both with the ADA and with the coordination regulations issued by the Department of Health, Education, and Welfare under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794 (1988), concerning nondiscrimination by recipients of federal financial assistance. 42 U.S.C. Sec. 12134(b) (1988 & Supp.1991). These regulations are now codified at 28 C.F.R. pt. 41 (1992). With regard to program accessibility in existing facilities and communications, Congress directed that the regulations be consistent with the Department of Justice's Section 504 regulations for federally conducted activities. See 28 C.F.R. pt. 39 (1992).
 
 
 21
 Following this mandate, the Department of Justice issued regulations maintaining the previously established distinction between existing facilities, which are covered by 28 C.F.R. 35.150 (1992), and new construction and alterations, which are covered by 28 C.F.R. 35.151 (1992). With limited exceptions, the regulations do not require public entities to retrofit existing facilities immediately and completely. Rather, a flexible concept of accessibility is employed, and entities are generally excused from making fundamental alterations to existing programs and bearing undue financial burdens. 28 C.F.R. 35.150(a) & (b) (1992). In contrast, the regulations concerning new construction and alterations are substantially more stringent. When a public entity independently decides to alter a facility, it "shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. 35.151(b) (1992). This obligation of accessibility for alterations does not allow for non-compliance based upon undue burden.
 
 
 22
 Consistent with the emphasis on architectural barriers, the installation of curb cuts is specifically given priority in both the "existing facilities" and the "new constructions and alterations" sections of the regulations. Streets are considered existing facilities under the regulations,[3] and, as such, they are subject to the more lenient provisions of Sec. 35.150. However, because of the importance attributed to curb cuts, the regulations direct public entities to fashion a transition plan for existing facilities, containing a "schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act." 28 C.F.R. 35.150(d)(2) (1992). These changes must be completed by January 26, 1995. 28 C.F.R. 35.150(c) (1992).
 
 
 23
 The existence of a transition plan for the installation of curb cuts on existing streets does not, however, negate the City's obligations under Sec. 35.151, governing alterations.[4] In addition to the general provision in subpart (b), Sec. 35.151 has a second subpart addressed solely to the installation of curb ramps. This subpart provides that when a public entity undertakes to construct new streets or to alter existing ones, it shall take that opportunity to install curb ramps.
 
 
 24
 Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway.
 
 
 25
 28 C.F.R. 35.151(e) (1992). The City does not dispute the literal requirement that the regulation mandates the installation of curb cuts when the City "alters" a street. The City does, however, protest the notion that the resurfacing of a street constitutes an "alteration."
 
 
 26
 Subpart (e) does not explicitly define "alteration," either in general or as applied in particular instances. Our focus here is the specific application of the general provision in subpart (b) (alterations to existing facilities) to one subject in subpart (e) (streets). We will look first to subpart (b) for guidance:
 
 
 27
 Alteration. Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.
 
 
 28
 28 C.F.R. 35.151(b) (1992) (emphasis added). In addition, subpart (c) provides that alterations made in conformity with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (the "ADAAG") or with the Uniform Federal Accessibility Standards (the "UFAS") shall be deemed to comply with the requirements of this section. Both guidelines provide technical and engineering specifications. The ADAAG definition of "alteration" is substantially the same as that in the regulation: "a change to a building or facility ... that affects or could affect the usability of the building or facility or part thereof." 28 C.F.R. pt. 36, app. A. It continues: "[n]ormal maintenance ... [is] not [an] alteration[ ] unless [it] affect[s] the usability of the building or facility." Id. (emphasis added).
 
 
 29
 These provisions lead one to the conclusion that an "alteration" within the meaning of the regulations is a change that affects the usability of the facility involved.[5] If we then read the "affects usability" definition into subpart (e), the regulation serves the substantive purpose of requiring equal treatment: if an alteration renders a street more "usable" to those presently using it, such increased utility must also be made fully accessible to the disabled through the installation of curb ramps.
 
 
 30
 Subpart (e) effectively unifies a street and its curbs for treatment as interdependent facilities. If a street is to be altered to make it more usable for the general public, it must also be made more usable for those with ambulatory disabilities. At the time that the City determines that funds will be expended to alter the street, the City is also required to modify the curbs so that they are no longer a barrier to the usability of the streets by the disabled. This interpretation helps to implement the legislative vision, for Congress felt that it was discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded.
 
 
 31
 Although there is limited analysis of the "alterations" sections of Title II, the discussion of the parallel provision in Title III (addressing public accommodations) is helpful in our analysis here.[6] In the context of Title III, Congress' discussion of "affecting usability" focused on the "primary function" of a facility. "Areas containing primary functions refer to those portions of a place of public accommodations where significant goods, services, facilities, privileges, advantages or accommodations are provided." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 112 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 486. For example, "the path of travel[,] ... bathrooms, telephones, and drinking fountains [must be] ... readily accessible to and usable by individuals with disabilities." Id. at 394.
 
 
 32
 Thus, while Congress chose not to mandate full accessibility to existing facilities, it required that subsequent changes to a facility be undertaken in a non-discriminatory manner. The use of such changes must be made available to all. The emphasis on equal treatment is furthered, as well, by an expansive, remedial construction of the term "usability." "Usability should be broadly defined to include renovations which affect the use of a facility, and not simply changes which relate directly to access." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 3, at 64 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 487.
 
 
 33
 With this directive, we must now determine whether resurfacing a street affects its usability. Both physically and functionally, a street consists of its surface; from a utilitarian perspective, a street is a two-dimensional, one-plane facility. As intended, a street facilitates smooth, safe, and efficient travel of vehicles and pedestrians--in the language above, this is its "primary function."
 
 
 34
 As such, we can only agree with the district court that resurfacing a street affects it in ways integral to its purpose. As discussed above, "resurfacing" involves more than minor repairs or maintenance. At a minimum, it requires the laying of a new asphalt bed spanning the length and width of a city block.[7] The work is substantial, with substantial effect. As the district court described in its opinion granting plaintiffs' motion for summary judgement:
 
 
 35
 Resurfacing makes driving on and crossing streets easier and safer. It also helps to prevent damage to vehicles and injury to people, and generally promotes commerce and travel. The surface of a street is the part of the street that is "used" by both pedestrians and vehicular traffic. When that surface is improved, the street becomes more usable in a fundamental way.
 
 
 36
 Kinney, 812 F.Supp. 547, at 551.
 
 
 37
 Finally, we must consider the City's suggestion that interpretation of the ADA is always subject to a requirement of reasonableness. It is true that reasonableness language appears in the text of Sec. 35.151(b): "Each facility or part of a facility altered ... shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities" (emphasis added). The City relies on a prior decision of this court, Disabled in Action of Pennsylvania v. Sykes, 833 F.2d 1113 (3d Cir.1987), interpreting a Department of Transportation regulation that is similar to 28 C.F.R. 35.151(b).[8] There we stated that the relevant questions were "to what extent any alterations to a facility provide an opportunity to make the facility more accessible to handicapped persons" and "what degree of accessibility ... becomes 'feasible' within the scope of alterations." Sykes, 833 F.2d at 1120-21. Because the Sykes regulation referred to "accessibility" rather than "usability," with resulting limits on scope and effect, the district court found the case to be inapposite. We need not decide that issue. Were we considering alterations only covered by Sec. 35.151(b), the relevance of Sykes would be at issue. However, in this case the Attorney General has already determined, in promulgating Sec. 35.151(e), that the installation of curb cuts is feasible during the course of alterations to a street. Subpart (e) is a specific application of the general principle contained in subpart (b). Through its use of mandatory language, the Sykes questions have been answered.
 
 IV.
 
 38
 As a final argument, the City contends that, even if resurfacing is an "alteration" requiring the installation of curb cuts, it is entitled to assert an "undue burden" defense excusing compliance. There is no general undue burden defense in the ADA. Rather, following the Section 504 regulations for program access in existing facilities, as Congress intended, the ADA regulations provide for the defense only in limited circumstances. For example, Sec. 35.150(a)(3), governing "existing facilities," excuses a public entity from taking "any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."
 
 
 39
 As discussed above, there are logical reasons for the distinction between existing and new or altered facilities. Allowance of an undue burden defense for existing facilities serves as recognition that modification of such facilities may impose extraordinary costs. New construction and alterations, however, present an immediate opportunity to provide full accessibility. Congress recognized the competing social interests at stake: "While the integration of people with disabilities will sometimes involve substantial short-term burdens, both financial and administrative, the long-range effects of integration will benefit society as a whole." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 3, at 50 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 473. Balancing these interests, Congress acknowledged the existence of an undue burden defense for existing facilities but clearly warned, "[n]o other limitation should be implied in other areas." Id.
 
 
 40
 The City acknowledges that the defense is not available for alterations. Nonetheless, it makes a last-ditch attempt at characterizing a street and its curbs as separate facilities. As such, a curb would remain an existing facility susceptible to the "undue burden" defense even while the street that it abuts is being altered. As with our discussion of Sykes above, the express language of Sec. 35.151(e) refutes this reasoning. That section requires the installation of curb ramps if a street is altered. When the City decides that funds are available for the alteration of the street, the City must now understand that such a determination is to be made with the awareness that subpart (e) also requires alteration of the curbs. Thus, once the City undertakes to resurface a street, the accompanying curbs are no longer to be considered as existing facilities, subject to the "undue burden" defense of Sec. 35.150(a)(3). They are now, pursuant to the language of subpart (e), incorporated with a facility under alteration, pursuant to Sec. 35.151, so that the "undue burden" defense is no longer available.
 
 V.
 
 41
 For the foregoing reasons, we find that resurfacing of the city streets is an alteration within the meaning of 28 C.F.R. 35.151(b) which must be accompanied by the installation of curb cuts under 28 C.F.R. 35.151(e). We will affirm the decision of the district court.
 
 
 
 [1]
 The terms "curb ramps" and "curb cuts" are used interchangeably
 
 
 [2]
 Plaintiffs and defendant Yerusalim entered into a stipulation of settlement, requiring the installation of curb ramps at locations resurfaced by PennDOT since January 26, 1992. The district court approved the agreement. Defendant Yerusalim is not a party to this appeal
 
 
 [3]
 The regulations define "facility" to include "all or any portion of ... roads, walks, [or] passageways." 28 C.F.R. 35.104 (1992). See also 28 C.F.R. pt. 35, app. A (1992)
 
 
 [4]
 Because a plan for the installation of certain curb cuts is required, the City characterizes this suit as a mere "dispute over timing." Appellant's Reply Brief at 3. The City contends that requiring curb cuts in the course of resurfacing would result in "random, unprioritized and immediate installation" of curb cuts. Id. The City would rely on its transition plan, suggesting that it excuses the City from other, independent obligations in the regulations: "in the interim only serious alterations of a street should trigger the curb cut requirement." Id. The City also contends that the ADA and the regulations must allow a local government to set its own priorities as to which streets will have curb cuts installed first
 The City may have a transition plan providing for, at a minimum, curb cuts at certain of its intersections. Nevertheless, we cannot rewrite the plain language of the regulations. The applicable section uses unmodified, mandatory language: "altered streets, roads and highways must contain curb cuts." 28 C.F.R. 35.151(e) (1992). Thus, if, as we find below, a resurfacing is an alteration, curb cuts must be installed no matter what other priorities the transition plan may call for. Furthermore, though the City phrases its compliance as a mutually-exclusive choice, there is no inconsistency between a requirement of a transition plan covering priority areas and a requirement that curb cuts be installed whenever a street is altered. The two provisions complement each other in achieving the ultimate ADA goal of full access for people with disabilities.
 
 
 [5]
 In its emphasis upon functionality and utility, this definition is consistent with the goals of the ADA--the elimination of architectural barriers that presently preclude those with disabilities from full and equal participation in society
 
 
 [6]
 Like Title II, Title III bears the distinction between existing and new or altered facilities. Congress intended that the provisions of both titles be read consistently. The House Report states "The Committee intends ... that the forms of discrimination prohibited by [Title II] be identical to those set out in applicable provisions of Titles I and III of this legislation." H.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 367. See also H.Rep. No. 485, 101st Cong., 2d Sess, pt. 3, at 51 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 474 ("Title II should be read to incorporate provisions of Titles I and III which are not inconsistent with the regulations implementing Section 504 of the Rehabilitation Act of 1973....")
 
 
 [7]
 The City suggests that disposition on summary judgement was inappropriate because the district court failed to distinguish among the various types of resurfacing (paving, milling, and reconstruction). There is no dispute that some resurfacing jobs are more extensive than others. However, the district court based its decision, as we do here, on that which is common to all, the elements required by the City for any resurfacing. See supra p. 3
 
 
 [8]
 The regulation was promulgated to comply with Section 504 of the Rehabilitation Act of 1973, also the predecessor to section 202 of the ADA. The regulation is as follows:
 Each facility or part of a facility which is altered by, on behalf of, or for the use of a recipient [of Federal financial assistance] ... in a manner that affects or could affect the accessibility of the facility shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by handicapped persons.
 
 
 [49]
 C.F.R. 27.67(b) (1981)