**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3964
_____

DISABLED IN ACTION OF PENNSYLVANIA

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY ("SEPTA"),

Appellant

_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(No. 2-03-cv-01577)
District Judge: Honorable Gene E. K. Pratter
_____

Argued October 4, 2010

Before: SCIRICA, FUENTES, and JORDAN, Circuit Judges

(Opinion Filed:  February 16, 2011)


Jo Bennett (Argued)
Michael G. Tierce
Stevens & Lee
1818 Market Street, 29th Floor
Philadelphia, PA  19103-1702

Attorney for Appellant

Stephen F. Gold (Argued)
1709 Benjamin Franklin Pkwy, 2nd Floor
Philadelphia, PA 19103

Mark J. Murphy
Rocco J. Iacullo
Robin Resnick
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

        Attorneys for Appellee

---

OPINION OF THE COURT

---

Fuentes, <u>Circuit Judge</u>:

Disabled in Action of Pennsylvania ("DIA") has filed suit claiming that the Southeastern Pennsylvania Transportation Authority ("SEPTA")'s failure to make certain portions of its facilities accessible to individuals with disabilities after undertaking construction work at those facilities violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101, <u>et seq</u>. ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794, <u>et seq</u>. ("RA"). On appeal from the District Court's grant of summary judgment in favor of DIA, SEPTA argues that certain regulations issued by the Department of Transportation ("DOT") implementing the ADA establish that it was not required to make those portions of its facilities handicapped-accessible. For the reasons given below, we affirm.

**I.**

**A.      Background**

The facts of this case are fairly straightforward. Appellant SEPTA, an agency and instrumentality of the Commonwealth of Pennsylvania, provides public transportation, including train, subway, trolley, and

paratransit services in five counties of Pennsylvania. The dispute in this case concerns two separate SEPTA construction projects that involved a total of three of its stations in Philadelphia.

The first of these stations, the 15th and Market Street subway station, serves the Market-Frankford Elevated Subway Line. This station is not accessible to individuals with disabilities. It is connected with the second station in question, Suburban Station, via the extensive underground Penn Center Concourse, which is lined with shops and offices. Suburban Station is a regional rail station.[1] On the concourse level connecting Suburban Station and 15th Street Station, at approximately 15th Street and Market, is a courtyard ("the 15th Street Courtyard"). Through underground travel, it is possible to reach either Suburban Station or 15th and Market Street Station from the 15th Street Courtyard.[2]

In February 2001, as part of a larger renovation project, SEPTA received a permit from the City of Philadelphia (the "City") to begin replacement of the only stairway in the 15th Street Courtyard. The stairs, which had become unusable, were demolished and replaced, but no modifications were made to any load-bearing structure of the 15th Street Courtyard. The work was concluded in August 2002. This project had a budget of approximately $1.5 million dollars; SEPTA's expert estimated that the cost of installing an elevator in addition to the stairs would have made the project $810,000 more expensive. SEPTA has not

---

[1] "The SEPTA Regional Rail Division provides commuter rail service on thirteen branches to over 150 active stations in Philadelphia, Pennsylvania and its suburbs." Wikipedia, SEPTA Regional Rail, http://en.wikipedia.org/wiki/SEPTA_Regional_Rail (last visited November 8, 2010).

[2] The parties dispute whether the 15th Street Courtyard is an entrance to the 15th and Market Street Station or to Suburban Station. The District Court did not resolve this issue, and we do not find it necessary to resolve it in order to determine this case.

3

contended that it would be technically infeasible to install an elevator at that site.

Suburban Station is a "key station" in the SEPTA system and is therefore subject to special accessibility requirements under the ADA. In 2005, as part of its efforts to comply with those accessibility requirements, SEPTA installed two elevators in Suburban Station. The entrance to one of these elevators is on street level at 16th Street between Market Street and JFK Blvd., making it theoretically possible for a person using a wheelchair to descend there to the Penn Center Concourse and travel underground to the 15th Street Courtyard. Otherwise, the 15th Street Courtyard is inaccessible to individuals using wheelchairs.

The third station in question, City Hall Subway Station, is located at Broad Street and Market Street and serves the Broad Street Subway Line.[3] It, too, is inaccessible to those in wheelchairs. Before 2002, there was an inoperative escalator leading from a courtyard at the concourse level of City Hall Subway Station to street level in the southeast corner of Philadelphia City Hall Courtyard (the "City Hall Courtyard").

In June 2001, SEPTA undertook extensive repairs to the inoperative escalator at City Hall Courtyard by, among other things, replacing the internal mechanisms within the escalator's wheelwell. Again, no modifications were made to any load-bearing structures. The repairs at City Hall Courtyard cost approximately $1.2 million; SEPTA estimates that the cost of installing an elevator there would raise the total cost to $3.2 million. However, SEPTA has not claimed that it would be technically infeasible to install an elevator there, so long as it had sufficient access to the property.[4]

---

[3] City Hall Subway Station is not connected to either Suburban Station or the 15th Street Station.

[4] City Hall Courtyard is owned by the City of Philadelphia, not SEPTA.

## B.    The District Court's Decision

Appellee DIA is a nonprofit group which advocates for the civil rights of persons with disabilities. It filed a lawsuit against SEPTA in March 2003 alleging that SEPTA had violated both Title II of the ADA and the Rehabilitation Act[5] by failing to make the 15th Street Courtyard accessible to those with disabilities after replacing the stairway at that location. SEPTA moved to dismiss, arguing that the City was a required party to the litigation because the City owns the 15th Street Courtyard. That motion was granted as unopposed, but the Court subsequently vacated its order and DIA amended its complaint to add the City as a defendant. In October 2003, DIA filed a second amended complaint. DIA amended its complaint a third time in January 2004, adding an allegation that SEPTA was required to make City Hall Station accessible because that station constituted a "key station" as defined by the ADA and relevant regulations.

In August 2004, DIA and the City reached a settlement in which the City agreed to permit SEPTA to use the City's property to install an elevator at the 15th Street Courtyard.[6] In order to resolve DIA's claim that City Hall Station was a key station required to be made handicapped accessible, the City indicated that it would "give permission … for SEPTA to [] construct the City Hall Station renovation project which has been discussed by SEPTA and the Plaintiffs in conceptual form for years." It appears that the "renovation project" referenced by the settlement pertains to the construction of an elevator at Dilworth Plaza, which is a different location than

---

[5] The analysis below applies to both the ADA and the RA claims. "In light of the similarities between ... the ADA and RA and their implementing regulations, we construe and apply them in a consistent manner." Pennsylvania Prot. and Advocacy, Inc. v Pennsylvania Dep't of Pub. Welfare, 402 F.3d 374, 379 n.3 (3d Cir. 2005).

[6] SEPTA was not a party to the settlement reached between DIA and the City.

the City Hall Courtyard.[7]  The District Court dismissed the City from the action in light of the settlement.

DIA's fourth and final complaint was filed on February 15, 2005.  The fourth amended complaint, which named only SEPTA as a defendant, asserted two claims.  Count I contended that SEPTA violated the ADA and RA by making "alterations" to the 15th Street Courtyard and the City Hall Courtyard without also making the affected portions of the facilities accessible to individuals with disabilities.  That was the first time in the litigation that DIA alleged that the extensive work conducted on the escalator at City Hall Courtyard constituted an "alteration" within the meaning of the ADA.  Count II alleged that SEPTA had violated the ADA and RA by failing to make 15th Street Station and City Hall Station, both allegedly "key stations" within the meaning of the ADA and RA, handicapped accessible. DIA sought relief in the form of, among other things, an injunction requiring SEPTA "to begin construction immediately of elevators [] at the [15th Street Courtyard Entrance] to the Market-Frankford ... Line and at the City Hall Station Courtyard's Northwest and Southeast entrances to the Broad Street Subway Line to assure access for persons with disabilities, including persons who use wheelchairs ... ."

DIA and SEPTA later moved for summary judgment against each other.  In November 2006, the District Court granted summary judgment in favor of SEPTA, holding that DIA's claims were time-barred.  On appeal, we reversed the District Court's decision and remanded the case for further proceedings.  See Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transp. Auth., 539 F.3d 199 (3d Cir. 2008).  After remand, both parties again moved for summary judgment on the remaining claims.  The District Court granted summary judgment in favor of DIA, finding that SEPTA's work at both the 15th Street Courtyard and City Hall Courtyard constituted "alterations"  which triggered requirements under the ADA and the Rehabilitation Act to make both locations "readily accessible to" individuals with disabilities.

---

[7] Elevators at Dilworth Plaza would provide those with disabilities access to City Hall Station via the concourse level.

SEPTA has now appealed the District Court's decision.

## II.

"We exercise plenary review over a district court's summary judgment ruling." Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2009). "Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Id. (citing Ruehl v. Viacom, Inc., 500 F.3d 375, 380 n.6 (3d Cir. 2007)).

The ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(a) (2010). In enacting the law, Congress found that "discrimination against individuals with disabilities continue[s] to be a serious and pervasive problem" in American society and therefore sought to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. Id. § 12101(a)(2), (7). In particular, one of the ADA's aims is the elimination of "architectural [and] transportation ... barriers" to full participation in society by individuals with disabilities by, among other things, mandating the improvement of access to public transit. Id. § 12101(a)(5). Therefore, although it does not generally mandate that existing public transit facilities be made accessible, the ADA does impose specific requirements on public entities which build new facilities or make "alterations" to existing facilities.

"With respect to *alterations* of an existing facility or part thereof used in [public transit] that affect ... the usability of the facility or part thereof," the ADA provides that it is discriminatory for a public entity to "fail to make such alterations ... in such a manner that, to *the maximum extent feasible*, the altered portions of the facility are *readily accessible to*" individuals with disabilities. 42 U.S.C. § 12147(a) (2010) (emphases added). "Thus, while Congress chose not to mandate full accessibility to existing facilities, it required that subsequent changes to a facility be undertaken in a non-discriminatory manner." Kinney v. Yerusalim, 9

F.3d 1067, 1073 (3d Cir. 1993). In other words, if a public entity chooses to make changes rising to the level of "alterations" to a facility, it ordinarily must use that opportunity to make the altered part of the facility accessible, as well.

In order to resolve this case, we must consider in turn the meaning of the phrases "alterations," "the maximum extent feasible," and "readily accessible" and then their application to the SEPTA projects at issue.

## A. "Alterations"

Section 12147(a) of title 42 does not define the terms "alterations" or "the maximum extent feasible." However, the DOT has issued regulations that provide additional guidance as to their meaning. The implementing regulations set forth in 49 C.F.R. § 37.43(a)(1) echo the requirements of 42 U.S.C. § 12147(a). The regulations define "alterations" to mean

> a change to an existing facility, including, but not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls ... [but not] [n]ormal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical or electrical systems ... unless they affect the usability of the building or facility.

49 C.F.R. § 37.3. Therefore, "an 'alteration' within the meaning of the regulations is a change that affects the usability of the facility involved." Kinney, 9 F.3d at 1072. "Usability" in this context has "an expansive, remedial construction" and "should be broadly defined to include renovations which affect the use of a facility, and not simply changes which relate directly to access." Id. at 1072-73 (internal citations and quotations marks omitted). SEPTA argued in the District Court that the replacement of the stairway at the 15th Street Courtyard and the elevator repair work at the City Hall Courtyard were not alterations, but

rather final acts of maintenance. As the District Court noted, however, replacing an unusable stairway with a usable one and extensively changing an inoperative escalator so that it operates again surely affects the "usability" of the locations they service. The complete replacement of a stairway or total overhaul of an escalator should also be considered "remodeling, renovation, rehabilitation [or] reconstruction" in the ordinary sense of those words.

SEPTA has now abandoned the "final act of maintenance" argument and instead points to certain Americans with Disabilities Act Accessibility Guidelines ("ADAAG") standards incorporated into the DOT regulations, which it contends further limit the types of construction which are "alterations" under the ADA.[8] It claims that the District Court did not give appropriate deference to these regulations, as mandated by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). In particular, SEPTA relies on an ADAAG provision which reads:

> If an escalator or stair is planned or installed where none existed previously and major structural modifications are necessary for such installation, then a means of accessible vertical access shall be provided that complies with the applicable provisions.

ADAAG § 4.1.6(1)(f). SEPTA argues that this indicates that "alterations," at least with respect to stairs, includes only changes that involve "major structural modifications." As it did not undertake "major structural modifications" of either the 15th Street or the City Hall Courtyards, it contends, it is not required to install an elevator in either location.

We assume, and DIA does not dispute, that the DOT regulations should be given Chevron deference in this case. However, the courts owe no deference to SEPTA's *own* interpretation of these regulations, and, as the District Court concluded, SEPTA's interpretation is too narrow. The ADA

---

[8] The relevant ADAAG standards are the 1991 version, codified at 49 C.F.R. Pt. 37, App. A.

is a remedial statute, meant to bring an end to discrimination against individuals with disabilities in all aspects of American life; it must be construed with all the liberality necessary to achieve such purposes. In our view, the construction carried out by SEPTA in both the 15th Street Courtyard and the City Hall Courtyard constituted "alterations" under the ADA, even without "major structural alterations." Although ADAAG § 4.1.6(1)(f) addresses one scenario in which an accessible means of vertical access must be provided, it does not clearly indicate that this is the *only* scenario in which such access must be provided.

SEPTA's reading is at odds with the otherwise broad accessibility mandate of 42 U.S.C. § 12147(a) and 49 C.F.R. § 37.43 and the expansive definition of "usability" adopted by this Circuit. In Kinney, we held that even the resurfacing of a road through the laying down of a new layer of asphalt was an "alteration" sufficient to require that the road be made accessible through curb cuts, 9 F.3d at 1073-74; it cannot be that the much more substantial change of a complete replacement of a set of stairs or an escalator is not an "alteration" unless it is accompanied by major structural modifications.

The DOT regulations confirm this conclusion. SEPTA must "mee[t] the requirements of [49 C.F.R. § 37] *and* the requirements set forth in [the ADAAG]." 49 C.F.R. § 37.9(a) (emphasis added). This language indicates that public entities must fulfill both § 37 and the ADAAG requirements. The DOT did not envisage the ADAAG by themselves to be an exhaustive statement of regulatory requirements, but rather to be a supplement to the requirements imposed by § 37. Meeting the requirements of Section 4.1.6(1)(f) is not, then, necessarily sufficient to meet the requirements of § 37, and it would be illogical to read Section 4.1.6(1)(f) of the ADAAG to radically curtail the broad mandate of § 37.

Given that the ADA is to be liberally construed to effectuate its purpose of eliminating discrimination, we will not adopt SEPTA's narrow interpretation of "alterations." In our view, the construction carried out by SEPTA in both the 15th Street Courtyard and the City Hall Courtyard constituted

10

"alterations" under the ADA, even though it did not entail "major structural alterations."

## B.    "Maximum extent feasible"

The parties also differ over the meaning of the phrase "maximum extent feasible."  Again, this term is defined in the relevant DOT regulations: "the phrase [']to the maximum extent feasible['] applies to the occasional case where the nature of an existing facility makes it impossible to comply fully with applicable accessibility standards ... ." 49 C.F.R. § 37.43(b).  DIA argues that "feasible" refers only to technical feasibility, relying on this definition's lack of explicit reference to costs.  SEPTA, in turn, argues that "feasible" must refer to economic feasibility, as well.[9]

We have never addressed the meaning of "maximum extent feasible" under the ADA as applied to alterations in public transit facilities.  SEPTA's position that "maximum extent feasible" must refer to economic as well as technical feasibility might be plausible if that language stood alone. However, the narrowness of the exception established in 49 C.F.R. § 37.43(b), which contemplates that the infeasibility of making the altered portion of a facility will be only "occasional" and will arise from "the nature of an existing facility"—not from the budget limitations of a transportation authority, which must be reckoned with at all times—weighs in favor of DIA's interpretation.

In addition, both 42 U.S.C. § 12147(a) and 49 C.F.R. § 37.43 do contain provisions for the consideration of cost in making public transit facilities accessible, but only in *different* sections establishing requirements for certain additional changes (e.g., to the bathrooms and drinking fountains) that must be made "to the maximum extent

---

[9] Although SEPTA has provided information that the costs of installing elevators at the two courtyards might be *disproportionate* to the cost of the rest of the construction projects there, it has not actually argued before us that the installation of the elevators was truly economically *infeasible*, nor has it explained how the Court would make such a determination.

11

feasible" if an area that serves a "primary function" is altered. The costs for those additional changes should not be "disproportionate." See 42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(2). The sections addressing "alterations" in general contain no such language. The omission of any reference to costs there, when they are mentioned in closely-related sections, indicates that the ADA and the DOT regulations define feasibility primarily with respect to technical, not purely economic, concerns.[10]

The Second Circuit recently reached the same conclusion with respect to identical language in Title III of the ADA and the relevant federal regulations (specifically, 42 U.S.C. § 12183 and 28 C.F.R. § 36.402(c)). Focusing on the language of the statute, it held that the ADA's "'maximum extent feasible' requirement does not ask the court to make a judgment involving costs and benefits ... . The statute and regulations require that such facilities be made accessible even if the cost of doing so—financial or otherwise—is high." Roberts v. Royal Atlantic Corp., 542 F.3d 363, 371 (2d Cir. 2008). The reasoning of Roberts is sound and applicable in the Title II context as well.

SEPTA also makes a more specific argument concerning the meaning of "maximum extent feasible" which relies on the interpretive appendix to 49 C.F.R. § 37. Appendix D states:

---

[10] Technical infeasibility will likely, in practice, often overlap with particularly excessive costs; that is, the more technically difficult an alteration, the more expensive it is likely to be. But the ADA does contemplate that, in general, if a public entity cannot afford to make alterations to a public transit facility that include making the altered portions accessible, it should not make alterations at all. "Congress felt that it was discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded." Kinney, 9 F.3d at 1073. Although this is a demanding requirement, it is consistent with the ADA's nature as a far-reaching anti-discrimination statute.

The term 'to the maximum extent feasible' should be construed as not requiring entities to make building alterations that have little likelihood of being accomplished without removing or altering a load-bearing structural member unless the load-bearing structural member is otherwise being removed or altered as part of the alteration.

49 C.F.R. Pt. 37 App. D. SEPTA interprets this as a limitation designed to prevent excessive expenditures on accessibility measures. It notes that it did not remove or alter any load-bearing structural members in the course of its work in either the 15th Street Courtyard or the City Hall Courtyard. Therefore, it argues, it was not "feasible" to install elevators in either location.

This reading, too, is unpersuasive. The regulations provide that a public entity need not make altered portions of a facility readily accessible if doing so would require removing or altering a load-bearing structural member (unless the movement or alteration is called for by the alterations anyway). They do not state, as SEPTA argues, the converse: that the altered portions of a facility *only* need be made accessible if the alterations in question involve the drastic change of moving or altering a load-bearing member. And as SEPTA has not taken the position that installing an elevator in either location would require the removal or alteration of a load-bearing member, this provision of Appendix D does not apply on the present record.

Therefore, SEPTA may not refuse to install elevators at the 15th Street Courtyard and the City Hall Courtyard solely because to do so would, allegedly, force SEPTA to incur significant costs.

C.     **"Readily accessible"**

The parties also dispute the meaning of "readily accessible." SEPTA argues that the 15th Street Courtyard is a part of Suburban Station, not of 15th Street Station, and thus, since the 15th Street Courtyard may be reached from street level by individuals in wheelchairs via one of the Suburban

13

Station elevators, it is already "readily accessible."[11]   DIA argues that the 15th Street Courtyard is actually a part of 15th Street Station, and since the facility which it is a part of is not wheelchair-accessible, neither is the Courtyard.  In addition, DIA argues that, even if the 15th Street Courtyard is part of Suburban Station, it is still not "readily accessible" via Suburban Station.

The District Court did not make a finding as to which station the 15th Street Courtyard is a part of.[12]   Like the District Court, we need not address the question of which facility the 15th Street Courtyard belongs to because, either way, SEPTA must make it accessible.

If we consider the 15th Street Courtyard Entrance to be part of Suburban Station, as SEPTA contends, it is still not "readily accessible."   Pursuant to ADAAG § 10.1, all transportation facilities must comply with the applicable provisions of §§ 4.1 through 4.35, §§ 5 through 9, and the applicable provisions of § 10 of the ADAAG.  Through a circuitous regulatory route,[13]   the "new construction"

---

[11]  SEPTA does not argue that City Hall Courtyard is "readily accessible," and so there is no need to engage in this analysis for that Courtyard.

[12]  On the first appeal, we noted that the 15th Street Courtyard "undisputedly provides access to" the 15th Street Station, and assumed that it was an entrance to that station. Disabled in Action, 539 F.3d at 202 n.1.

[13]  Section 10.1 of the ADAAG states that "[e]very station … shall comply with the applicable provisions of 4.1 through 4.35 … ."   Section 4.1.6(1)(b) mandates that "if existing elements, spaces, or common areas are altered, then each such altered element, space, feature, or area shall comply with the applicable provisions of 4.1.1 to 4.1.3 Minimum Requirements (for New Construction)."  Section 4.1.3(8) lays out requirements for the number of accessible entrances but those requirements are, in turn, modified by § 10.3.1, which says that, "[i]n lieu of compliance with 4.1.3(8), at least one entrance to each station shall comply with 4.14 [and be made accessible]."  ADAAG § 10.3.1(2).

provisions for transportation facilities, found at ADAAG § 10.3.1, permit a public transportation provider to avoid making an altered entrance accessible if at least one entrance to the affected station is already accessible. ADAAG § 10.3.1(2). However, "[i]f different entrances to a station serve different transportation fixed routes or groups of fixed routes, at least one entrance serving each group or route shall [be made accessible]." Id. Here, there is no accessible entrance that serves the 15th Street Station or the Market-Frankford subway line—a different route than those serviced by Suburban Station, which serves commuter rail lines. Thus, even assuming that the 15th Street Courtyard Entrance is a part of Suburban Station, it nevertheless provides access to a different fixed route and therefore must be made accessible. If, on the other hand, the entrance at issue is a part of 15th Street Station, the alterations performed by SEPTA require that the entrance be made readily accessible since it is undisputed that 15th Street Station is not handicapped accessible.[14]

Because neither the 15th Street Courtyard or the City Hall Courtyard is "readily accessible," SEPTA violated Title II of the ADA and the RA by not making those portions of its facilities accessible when it undertook to make alterations at those locations.

---

[14] SEPTA does not deny that the 15th Street Station is not "readily accessible." Instead, SEPTA argues that "[e]ven if an elevator were installed at the 15th Street [Courtyard Entrance], a person in a wheelchair could not access 15th Street Subway Station" because there is no wheelchair access from the concourse to the subway platform. (BB at 38.) While SEPTA's assertion is correct, the District Court already aptly addressed this issue, finding that the ADA is an "incremental statute." (App. at 26.) According to the District Court, "[g]iven that eventually SEPTA will alter the stairway to the platform, triggering a requirement of additional accessibility, at that point, wheelchair-bound individuals will have an accessible exit waiting for them at the mezzanine level." (Id. at 22-23.) Otherwise, to excuse public entities from complying with the accessibility requirements simply because they altered only a *portion* of a facility would undermine the intent of the ADA.

15

## D. The City as necessary party

Finally, SEPTA argues that, because it cannot install an elevator at City Hall Courtyard without the agreement of the City, the City is a necessary party to this suit. We may consider this issue despite its not being raised in the District Court, and we conclude that the City is not a necessary party. Finberg v. Sullivan, 634 F.2d 50, 55 (3d Cir. 1980). Under the Federal Rules, a party is "necessary" if, in its absence, (1) the court could not accord complete relief among the existing parties; or (2) the absent party claims an interest relating to the subject matter of the action so that disposing of the action in his absence would (i) impair its ability to adequately protect its interest, or (ii) leave an existing party susceptible to a substantial risk of incurring inconsistent obligations. Fed. R. Civ. P. 19(a). SEPTA bears the burden of showing why an absent party should be joined under Rule 19. Pittsburgh Logistics Sys., Inc. v. C.R. Eng., Inc., 669 F. Supp. 2d 613, 618 (W.D. Pa. 2009). DIA claims SEPTA's failure to assert this defense at an earlier stage of the proceedings renders it unfit for consideration on appeal. See Fed. R. Civ. P. 12(b)(7) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required."). SEPTA acknowledges its failure to include this defense in any prior motion but nevertheless urges us to conduct an independent analysis.

While the law permits us to indulge SEPTA's overtures and consider this Rule 19 issue for the first time on appeal, the parties' lengthy history of silence on this issue weighs against adopting SEPTA's position. We have written that Supreme Court jurisprudence compels us to "take steps to protect an absent party through consideration of the Rule 19 issue, even when that issue was not presented to the district court nor raised by the parties to the appeal." GTE Sylvania, Inc. v. Consumer Product Safety Comm'n, 598 F.2d 790, 798 (3d Cir. 1979). However, the opinion from which we gleaned this obligation evinced genuine concern only for protecting an absent party "who of course had no opportunity to plead and prove his interest below." Provident Tradesmen Bank & Trust Co. v. Patterson, 390 U.S. 102, 111 (1968).

16

SEPTA argues that upholding the grant of summary judgment will, as a practical matter, impair the City's ability to protect its interest in City Hall Courtyard. See Fed. R. Civ. P. 19(a)(1)(B)(i). However, though the City was a defendant in this case and was aware that it implicated access by individuals with disabilities to the City Hall Courtyard, it chose to settle with DIA. Although it surely must be aware of DIA's current position with respect to the necessity of an elevator in City Hall Courtyard, it has not moved to intervene, nor offered any other objections which we are aware of. That neither the City nor SEPTA saw fit to raise this issue at an earlier stage of the proceedings militates against a finding that the City's ability to protect its interest would be impaired were it not joined as a party. The City's normal procedures in dealing with SEPTA construction projects that impinge upon City property, such as the process of submitting plans and obtaining required work permits, should be sufficient to protect its interests here.

SEPTA also contends that any relief granted by the court to DIA would be "hollow" in the absence of the City's joinder, see Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 315 (3d Cir. 2007). Yet it does not actually claim that the City would refuse to permit construction at City Hall Courtyard, merely that the City's ownership "would legitimately affect SEPTA's ability to fulfill its obligations under the order." Although this is very likely true, it would not render a judgment in favor of DIA "hollow"; it simply means that SEPTA will have to work with the City in complying with our decision, something the City has already agreed to do with respect to the 15th Street Courtyard.

## III.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in DIA's favor.

*Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority*, No. 09-3964

JORDAN, *Circuit Judge*, concurring in part and dissenting in part

I am fully in agreement with the majority's analysis of the obligations SEPTA has incurred under the ADA and associated regulations by making alterations at the 15th Street Courtyard,[1] and, based on the precedential effect of those conclusions, I am strongly inclined to believe that they will compel the further conclusion that SEPTA bears the same obligations with regard to the City Hall Courtyard. I cannot join Section II.D of the opinion, however, because I believe that the City must first be made a party to this action under Federal Rule of Civil Procedure 19 before a decision regarding the City's property can rightly be made.

While SEPTA is free to begin installing an elevator at the 15th Street Courtyard, it is not free to do so at the City Hall Courtyard, which is owned by the City. As the Majority notes, SEPTA acknowledges the feasibility of installing an elevator at the City Hall Courtyard, but it does so only "so

_____

[1] Although the Majority's analysis is confined to the ADA, it concludes that the same result is required by the Rehabilitation Act ("RA"). Given the close relationship between those two statutory schemes, *see McDonald v. Com. of Pa., Dep't of Public Welfare*, 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same."), I do not doubt that is so, but it is not necessary to assume or decide that here.

1

long as it [has] sufficient access to the property." (Maj. Op. at 4.) Access to the property is essential and, to be properly granted by a court order, such access must be preceded by the City's having a seat at the litigation table. This seems self-evident. Ordering the construction of an elevator calls for a "permanent physical invasion" of the City's property and "eviscerates the owner's right to exclude others from entering and using [the] property – perhaps the most fundamental of all property interests." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). I have searched in vain for an example of a court ordering such an invasion without the property owner being joined in the case.

Nevertheless, DIA argues, and the Majority accepts, that the District Court can afford DIA complete relief at the City Hall Courtyard, even though doing so would require SEPTA to initiate construction on the City's land. DIA implicitly acknowledges in its brief that the City might object to bulldozers and backhoes showing up on its property, but it suggests that, if the City were to bar SEPTA from making the required alterations, SEPTA could "assert a defense of impossibility to an effort by DIA to enforce the Court's ruling." (Answering Brief of Appellee at 48 n.18.) However, the very fact that the Court's ruling could result in such an "impossibility" is why the City is, by the terms of Rule 19, a "required party" in this lawsuit. *See* FED. R. CIV. P. 19(a)(1) ("A person … must be joined as a party if … in that person's absence, the court cannot accord complete relief among existing parties … .").[2]

---

[2] Being a "required party" under Rule 19 is contingent upon the party being "subject to service of process" and being a party "whose joinder will not deprive the court of subject-

2

Shifting its tack, DIA, with the Majority in tow, breezes past the City's fundamental interest in this dispute by asserting that the City is aware of the proposal to install an elevator at the City Hall Courtyard and has no objection to it. That may well be true; indeed one hopes that the City would be eager to assist in every way possible the remedying of inaccessibility problems on its property. But we are accustomed to having property owners declare their own interests and intentions rather than having others volunteer their land for construction projects. That is why Rule 19, again by its exact terms, requires the joinder of someone who, as a practical matter, would have his ability to protect his interests impeded or impaired if not made a party. FED. R. CIV. P. 19(a)(1)(B)(i). Making the point more powerfully, the Rule goes on to say that "[i]f a person has not been joined as required, the court *must* order that the person be made a party." FED. R. CIV. P. 19(a)(2) (emphasis added). It does not say, "add that person if convenient or if you don't already know what the person really wants." It says, straightforwardly, that "the court *must* order that the person be made a party."

In trying to understand what may be motivating the willingness to brush aside the City's obvious interest in a construction project on City land, I am left to conclude that there is a concern over further delay in SEPTA's beginning the already long-delayed start of installing necessary accommodations, and perhaps there is some concern that

---

matter jurisdiction," conditions which the City satisfies. FED. R. CIV. P. 19(a)(1).

3

SEPTA raised the issue late as a yet another strategic move for procrastination. Even if those concerns are well-founded, however, they do not dispose of the City's rights. "A person may be added as a party at any stage of the action on motion or on the court's initiative … and a motion to dismiss, on the ground that a person has not been joined and justice requires that the action should not proceed in his absence, may be made as late as the trial on the merits … ." Advisory Committee's Notes on FED. R. CIV. P. 19, 28 U.S.C.App., p. 134.

Nor can the City's interests be casually dismissed by saying, as the Majority does, that, "[a]lthough [the City] surely must be aware of DIA's current position with respect to the necessity of an elevator in City Hall Courtyard, it has not moved to intervene, nor offered any objections which we are aware of." (Maj. Op. at 17.) That statement implies, without record support, that the City somehow waived its rights to protect its property interests in court. The City was added as a party to this case in 2003 and settled with DIA in 2004. If anything, that history demonstrates that the City left the case only when it understood that its rights were no longer implicated. It does not demonstrate that the City should have known that its rights would be implicated once again.[3]

---

[3] In its settlement agreement with DIA, the City acquiesced to construction of an elevator at the 15th Street Courtyard and agreed to permit construction of an elevator at Dilworth Plaza to service City Hall Station, as had "been discussed by SEPTA and the Plaintiffs in conceptual form for years." (App. at 89-90.) But Dilworth Plaza is not the City Hall Courtyard, the location where DIA currently seeks to have an elevator installed to service City Hall Station. While

It is, moreover, somewhat ironic to observe that we are unaware of the City having any objection to plans for its land, since an important reason why a district court must join required parties is so that such parties have the opportunity to voice objections. *See Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72 (3d Cir. 1993) ("Before a party may be deprived of a property interest, due process requires, at a minimum, notice and an opportunity to be heard."). We approach the problem from the wrong direction when our first reaction is to say to a property owner, in effect, "you failed to intervene at the peril of your rights," rather than saying to the litigants, "you failed to add a required party at the peril of lengthening these proceedings while that party's rights are considered."

DIA maintains, and the Majority agrees, that the City's normal procedures in dealing with construction projects, such as requiring work permits, should be sufficient to protect its interests here. Once again, though, this seems a painful stretch to avoid dealing with the reality that the City is a required party. The City's permitting procedures do not provide it with a voice in the District Court by which it can object to orders directly affecting its interest in its own land.

---

the City and SEPTA have engaged in discussions regarding compliance with the District Court's order, the record does not reflect that any agreement was reached on the precise location for the installation of elevators at the City Hall Courtyard. Indeed, the Statement of Compliance that SEPTA filed with the District Court says that the "City prefers installation of elevators at locations other than those directed by the Court." (App. at 1163.)

The permitting process is, as far as I know (and this is not an issue that has been briefed), designed simply to ensure that construction in the City is completed in accordance with applicable sections of the Philadelphia Code, *e.g.*, the City's building code, fire code, and electrical code. Those procedures do not afford the City the opportunity to address to the District Court any concerns it may have about where, when, or how an elevator will be installed on City property.

In any event, concern about significant delay is ultimately a matter of pure speculation, and an oddly contradictory bit of speculation at that. If, as DIA and the Majority assume, the City has no problem at all with the construction of the elevator on City land, then adding the City as a party should involve little or no delay at all, even as it preserves the principles of due process that are inherent in Rule 19 and which long antedate the Rules of Civil Procedure. *Cf. Torrence v. Shedd*, 144 U.S. 527, 532 (1892) (holding that, in a case involving interests in real property, since recovery required establishing a title that would affect other interested parties, those parties had to be joined). And if, for some reason, the City were to raise objections, the able District Court can require that those objections be dealt with on an expedited basis, as may be appropriate.

I therefore concur in the opinion of the Majority that the construction of the elevator at the 15th Street Courtyard is called for by operative federal law, but I would order the joinder of the City so that it can adequately voice its position on how that conclusion should affect its property interests in the City Hall Courtyard.

6