**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3791
_____

ALPHA PAINTING & CONSTRUCTION CO INC.

v.

DELAWARE RIVER PORT AUTHORITY OF
THE COMMONWEALTH OF PENNSYLVANIA AND
THE STATE OF NEW JERSEY,
                                    Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No.: 1-16-cv-05141)
District Judge: Honorable Noel L. Hillman

_____

Argued February 9, 2017


Before:  MCKEE, RENDELL, and FUENTES, Circuit Judges

(Opinion Filed: April 6, 2017)

John M. Elliott, Esq. [ARGUED]
Bruce W. Kauffman, Esq.
Thomas J. Elliott, Esq.
Stewart J. Greenleaf, Jr., Esq.
Elliot Greenleaf, P.C.
925 Harvest Drive
Suite 300
Blue Bell, PA 19422

*Counsel for Appellant Delaware River Port Authority of the Commonwealth of Pennsylvania & the State of New Jersey*


Jennifer A. Hradil, Esq. [ARGUED]
Kaitlyn E. Stone, Esq
Peter J. Torcicollo, Esq.
Kevin W. Weber, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

*Counsel for Appellee Alpha Painting & Construction Company, Inc.*

———————

O P I N I O N
———————

**RENDELL**, <u>Circuit Judge</u>:

This case arises from a bitter bidding dispute for a contract to strip and repaint the Commodore Barry Bridge. The Delaware River Port Authority ("DRPA") rejected the lowest bidder, Alpha Painting & Construction Company, Inc. ("Alpha"), because it determined that Alpha was not a "responsible" contractor. Instead, DRPA awarded the contract to Corcon, Inc. ("Corcon"). After its bid protest was denied, Alpha filed this lawsuit in District Court on an expedited basis seeking an injunction against DRPA. The District Court promptly held a four-day trial and concluded that DRPA acted arbitrarily and capriciously. It then entered an order directing DRPA to award the contract to Alpha. DRPA appeals.

For the reasons that follow, we will affirm the District Court's ruling that DRPA acted arbitrarily and capriciously. However, because we conclude that the District Court abused its discretion by directing that the contract be awarded to Alpha, we will vacate that portion of the order and remand to the District Court for the entry of a more limited injunction.

## I. Background

### A. Factual Background

DRPA is a bi-state corporate instrumentality that owns, operates, and maintains four bridges that span the Delaware River between New Jersey and Pennsylvania, including the Commodore Barry Bridge, a mile-long structure that supports five lanes of traffic. DRPA is governed by a Board of Commissioners and operated on a day-to-day basis by its staff of engineers, contracting administrators, legal counsel, and administrative support professionals. Recently,

3

DRPA's staff determined that the Commodore Barry Bridge's lead-based paint coating is deteriorating. DRPA decided to repaint the entire bridge, a substantial capital construction project that requires hiring a contractor capable of using highly specialized abrasive blast cleaning equipment to strip and contain the lead paint (hereinafter the "Bridge Project"). This equipment is necessary to protect workers, the public, and the environment from hazardous lead contaminants.

DRPA divided the Bridge Project into three phases. Phase 1, now near completion, involved stripping and repainting the New Jersey approach spans. Corcon is performing that work. Phase 2, which DRPA is now soliciting, will involve repainting the Pennsylvania approach spans. Phase 3, which has not yet begun, will involve repainting the center span portion. The Phase 2 contract is the subject of the instant dispute (identified herein as "Contract No. CB-31-2016" or the Phase 2 contract).

In early May, 2016, DRPA began soliciting bids for the Phase 2 contract. On June 16, 2016, the due date for submissions, DRPA received seven bids, including Alpha's and Corcon's. That same afternoon, DRPA assembled the bidders for Phase 2 in its conference room to open the bids publicly. Among those present were Adam Jacurak, DRPA's senior engineer in charge of the Phase 2 project, Amy Ash, DRPA's Director of Contract Administration, as well as the bidders. Ash opened the bid packages and declared Alpha the "apparent low bidder" because it bid the lowest price, $17,886,000. Corcon bid $17,896,200 (the second lowest price, $10,200 more than Alpha).

4

Both Alpha and Corcon have significant experience painting bridges. Alpha, a Maryland-based industrial painting contractor, has painted numerous bridges across the country and is prequalified to bid for such work in 40 states. Alpha has previously worked for DRPA, painting the Pennsylvania approach span of another one of its bridges between 2007 and 2009. Alpha also worked on a non-DRPA project at Philadelphia's 30th Street Station in 2014 as part of a joint venture with another contractor. Alpha has not performed any other work in Pennslyvania or New Jersey over the last five years.

Corcon, a national bridge painting contractor, has also worked for DRPA. Currently, it is painting Phase 1 of the Bridge Project and there is evidence that it has recently painted other DRPA bridges as well. Moreover, DRPA is collaborating with Corcon on an extracurricular film project concerning Corcon's work on the Commodore Barry and other DRPA bridges.[1]

After DRPA determined that Alpha and Corcon were the lowest and second lowest bidders, respectively, it undertook a review of the bids. Over the next two months, after a process largely characterized by inaction and delay, DRPA ultimately rejected Alpha's bid and selected Corcon's.

---

[1] At trial, no one from Corcon testified. DRPA's chief engineer, Michael Venuto, acknowledged the film project during a line of questioning by Alpha's counsel ostensibly aimed at suggesting possible motives for DRPA to favor Corcon over Alpha. While Venuto admitted that this film required access to the bridge, Venuto did not think DRPA had any financial stake in the project.

Two determinations form the heart of Alpha's challenge. First, DRPA declared that Alpha was "not [a] responsible" contractor under its guidelines because Alpha failed to remit certain accident experience forms (called OSHA 300 forms) and insurance data (in the form of Experience Modification Factors, or EMFs) in its bid package. A.1037. As discussed *infra*, DRPA uses this data to assess a bidder's job-site "safety culture." A.1756. Second, DRPA declared that Corcon was in fact the lowest bidder because of a "miscalculation" that DRPA perceived in Corcon's bid. A.3821. DRPA's conduct leading to these determinations (all of which occurred sometime between June 16 and August 9, 2016) was the subject of Alpha's challenge before the District Court.

We too will focus on this time period. At trial, DRPA presented documentary evidence including its guidelines, emails to and from certain employees, and emails between DRPA and certain bidders, as well as the testimony of four of its employees. We think it most helpful to proceed by first briefly reviewing applicable portions of DRPA's bidding guidelines. Next, we will discuss how DRPA analyzes OSHA 300 forms and EMFs. Finally, we will recount the specific aspects of DRPA's two determinations that are challenged by Alpha.

**1. DRPA's Bidding Guidelines**

DRPA's bidding guidelines are internal regulations adopted by DRPA that govern its procurement of services for

work on its bridges.[2] When DRPA seeks construction and maintenance services, in particular, it uses the Competitive Sealed Bid procurement method. Under that method, DRPA must issue an Invitation for Bids ("IFB") detailing the project, collect and publically open sealed bids at a set time and place, and declare an apparent low bidder. Then, after a subsequent investigation, the guidelines require that DRPA award the contract to the "lowest *responsible* and *responsive* [b]idder" unless all bids are rejected or the lowest bidder is allowed to withdraw its bid. A.110 (emphasis added).

The guidelines thus set up a process whereby DRPA must perform two distinct review inquiries. First, DRPA must determine, within ten days of submission, whether a bid is responsive. *See* A.495 ("Responsiveness of a bid is determined within ten (10) business days from the bid itself . . . ."). A responsive bid is one that "conforms in all material respects to the requirements and criteria in the invitation for bids." A.489. DRPA may, however, "waive technical defects or immaterial items" that would otherwise make a bid nonresponsive so long as the waiver does not undermine the competitive character of the bidding process. A.495.

Second, DRPA must separately determine whether the lowest bidder is responsible. A "responsible bidder . . . possess[es] the capability to fully perform the contract requirements in all respects and the integrity and reliability to assure good faith performance." A.524 (internal quotation

---

[2] By "bidding guidelines," we refer to the set of documents DRPA submitted to the District Court which govern its procurement process, particularly the Invitation for Bids, the Procurement Manual, and Engineers Manual.

marks omitted). Unlike responsiveness, this requirement "goes to the capacity of the bidder . . . rather than its willingness to perform on [DRPA's] terms." *Id.* "[C]apacity to perform involves not only its ability to meet quality, quantity and time requirements, but its business integrity to assure honest, good faith performance." *Id.* DRPA "may not presume that all bidders . . . are responsible," but instead has an "affirmative duty" to make this determination with respect to the lowest bidder and to document its reasons for doing so in the contract file. *Id.*

If DRPA determines that the lowest bidder is responsible, DRPA must accept that bidder. DRPA may reject a bidder as "not responsible" and select a higher bidder, but only if its "investigation discloses a *substantial reason*" for doing so. *Id.* (emphasis added). The guidelines are clear that "[DRPA] should not base a determination of nonresponsibility on a single bad item or report unless the behavior or financial condition . . . is of a *sufficiently serious nature* as to call into question the *ability* or *integrity* of the bidder . . . to perform the contract." A.526 (emphasis added).

The guidelines go on, in a lengthy chapter dedicated entirely to the responsibility inquiry, to describe the rigorous, wide-ranging investigation that DRPA should undertake to fulfill this duty. The guidelines state that DRPA "is not limited in its investigation to reviewing information provided by the bidder[] with its bid[]" and "should take any steps it determines are necessary to ensure that a bidder . . . is responsible." A.526. Such steps include "request[ing] a bidder . . . to supply financial, educational, and experience information as well as references" or "requesting further clarification from the bidder[] as appropriate" during its

8

review. A.526. DRPA may also perform news and internet searches or public record database searches, and may review corporate filings, published consumer ratings, and certifications, just to mention a few.

**2. DRPA's Review of OSHA 300 Forms and EMF Factors**

According to DRPA, an important part of its responsibility investigation involves determining whether the bidder has a history of performing safely on the job. To facilitate this review, the IFB (§ A.10.3) states that all bidders "will supply with its [b]id, accident experience in the form of the standard OSHA 300 Report and its Experience Modification Factors [("EMFs")] for all work completed in the State of New Jersey and the Commonwealth of Pennsylvania, covering the preceding three (3) reporting years." A.84. DRPA then uses these EMFs and OSHA 300 forms to assess the "safety culture" of the bidder. A.1756.

OSHA 300 forms are completed by the contractor annually and provide a summary of the total number of company employees, total hours worked by those employees, the number of injuries reported, and a brief description of each injury.

EMFs are a creature of the insurance industry. They are numerical multipliers generated yearly by state-designated ratings bureaus, and they are assigned to every company that performs work within a particular state. The EMF calculation that produces this multiplier takes into account the frequency and severity of workers' compensation claims filed against

the company in that state. It does not account for workplace injuries to non-employees or injuries that do not result in a workers' compensation claim. Insurance firms then use a company's EMF to adjust the amount of workers' compensation insurance premium it has to pay for that year. For example, a company assigned a 1.00 EMF pays the standard market rate for insurance. A company assigned an EMF of less than 1.00 will get a "credit" on its premium and will pay less than the standard market rate for its insurance, while a company assigned an EMF greater than 1.00 will pay more.

Some states assign new contractors (or contractors who have never performed work in that state) an EMF of 1.00. But other states, like Pennsylvania, report that a new contractor "does not qualify" for an EMF (because it does not meet Pennsylvania's payroll threshold to qualify). From an insurance premium perspective, however, a company that "does not qualify" is indistinguishable from a firm assigned a 1.00 EMF because both would pay the standard market rate of insurance.[3]

How DRPA actually goes about employing this information to assess "safety culture" was the subject of much discussion at trial. As best we can tell, once DRPA receives bids for a given project, the senior engineer separates the bid

---

[3] DRPA's Director of Risk Management and Safety, Marianne Staszewski did not disagree. She only noted that from a "safety" review perspective, "does not qualify" means that there "is no measurement of [a firm's] safety performance" and its record in this regard would therefore be "inconclusive." A1782.

into its constituent parts and sends the OSHA 300 forms and EMFs to DRPA's Department of Risk Management and Safety. Marianne Staszewski, the Department's director (and the Department's only employee), then "[performs] a risk management review" of the OSHA 300s and EMFs, A.1709, which essentially amounts to determining whether the bidder has a positive "safety culture," A.1756.

DRPA's review, however, seems more perfunctory than analytic. In order to determine the "safety culture" of the bidder, Staszewski averages the three EMFs supplied with the bid.[4] A.1756. If the average is 1.25 or greater, she concludes, in her words, that the "contractor has had significant frequency or severity of losses within the last three years . . . which translates into not working safely on the job." A.1747. If the EMF average is less than 1.25, she approves the bidder because she is satisfied that it is "not suffering frequency and severity of losses." *Id.* During this process, Staszewski also considers the quantitative aspects of a bidder's OSHA 300s—the number of employees, hours worked, injuries reported—to contextualize its EMF score, although it was not clear from her testimony how this impacts her final analysis.[5] She does

---

[4] Staszewski testified that she considers EMFs only from the three most recent completed calendar years because the current, unfinished year provides a "green" number that indicates only a partial picture of safety for that year. A.1713. So for the Phase 2 contract, DRPA considered 2015, 2014, and 2013 EMFs.

[5] *Compare* A.1757 ("[T]he EMF factor is a statistical result of this OSHA 300 form, so you cannot take that out of the equation."), *with* A.1759 ("The consequence of my analysis is, if the prior three years averaged 1.25 or less, then they are approved.").

not consider the portion of the OSHA 300 form that describes the reported injuries.[6]

We now turn to the two disputed portions of DRPA's review in this case.

### 3. DRPA's Evaluation of Alpha's and Corcon's OSHA 300 and EMFs

With respect to Alpha's bid: on June 16, 2016, the day of the bid opening, DRPA's staff undertook a quick responsiveness review to determine compliance with § A.10.3. Jacurak and Ash testified that they flipped through Alpha's bid and noticed that it did not include OSHA 300 forms. DRPA, however, did not declare Alpha's bid "not responsive" to the IFB. Instead, Jacurak and Ash notified DRPA's general counsel to get guidance. Very little emerged about these discussions at trial, but apparently, counsel instructed the staff to circulate both Alpha's and Corcon's bids, rather than just Alpha's, to DRPA's various departments for a responsibility determination.

Three weeks later, on July 7, 2016, Jacurak emailed Staszewski with Alpha's EMF letter attached.[7] Alpha had

---

[6] In fact, Staszewski admitted that some rather egregious safety violations would not affect her analysis in any way. Alpha's counsel posed a hypothetical wherein a contractor drops an I-beam on a train passing on the bridge below, killing all aboard. Staszewski stated that so long as none of the persons on the train were employees, this fact would not be considered in DRPA's safety analysis.

[7] The documents presented at trial indicated that Jacurak also sent Staszewski a Department of Labor website

submitted a letter from its insurance broker which stated that "[Alpha] did not qualify for experience [EMF] rating[s] in 2016, 2015, 2014 and 2013" in either Pennsylvania or New Jersey. A.1021. It is undisputed that Alpha had not performed work in Pennsylvania or New Jersey as an individual entity in the last five years, although it had done work in Pennsylvania as part of a joint venture in 2013 and 2014 (which resulted in the joint venture being assigned an EMF of .933 and .837, respectively).[8] Staszewski determined that she could not effectively review Alpha's safety record under her EMF policy because "[Alpha] did no work in the State of Pennsylvania, . . . did no work in the State of New Jersey, [and thus] ha[d] no work experience" over these three years, A.1760, from which she could "conclusively" determine its safety culture, A.1786.

After roughly three more weeks of silence, on July 28, 2016, Ash prepared and sent Alpha a letter rejecting its bid (the "July 28 Rejection Letter"). The letter first cited the requirement that the bidder supply OSHA 300 forms and EMFs. Then it stated that Alpha's "failure to provide the OSHA Form 300 and its inability to provide experience modification factors back through 2013 prevent[ed DRPA]

---

printout containing information about Alpha's experience. Jacurak claimed that this printout was submitted with Alpha's bid in lieu of its OSHA 300 forms. The record is unclear what, if any, impact this had on DRPA's analysis.

[8] These 2013 and 2014 EMFs were not reported in the broker letter. Alpha's insurance broker later mailed DRPA a second letter containing these EMFs and reporting that it had incorrectly stated Alpha had not performed any work in Pennsylvania.

13

from substantially evaluating Alpha's safety record." A.1037. As a result, DRPA declared that it found "Alpha 'not responsible' for the subject Project, and therefore, [that] Alpha's bid [was] rejected." *Id.*

At trial, the parties vigorously disputed whether Alpha actually submitted its OSHA 300 forms, an inquiry which consumed much of the District Court's time. Tom Kousis, Alpha's project manager in charge of its Phase 2 bid, testified at length that he remembered submitting the forms. He pointed to a box on the bid form that he checked contemporaneously to his binding the bid package together. Jacurak and Ash maintained that none were submitted. Because no copies of Alpha's paper bid were made and all submissions were unbound during the subsequent bid review phase, it was impossible to determine from the documentary evidence whether Alpha had submitted these records.

The remainder of the testimony at trial focused on DRPA's determination that Alpha was "not responsible." Alpha's counsel tried to pinpoint exactly who made this guidelines determination. But no one seemed to know. Staszewski testified that she had no idea who made that determination in this case, and had only the faintest clue who does so in the ordinary course. Her "understanding" was that Amy Ash would make that call. A.1794. Ash, however, declined having anything to do with the responsibility determination. She testified that Jacurak told her "the director of risk management [i.e., Staszewski] found Alpha to be nonresponsible." A.1618. Jacurak reported "that is either – I have to say it's between legal and contracts administration." A.1532. DRPA's general counsel did not testify, nor is it clear

14

what business input, if any, he or she had in these determinations.

Alpha's counsel also questioned whether Staszewski, who the District Court described as "visibly flummoxed" at trial,[9] had identified anything in Alpha's submission or otherwise that suggested it was not a safe contractor. She maintained that Alpha's record, without EMFs, was inconclusive and therefore could not be approved. When asked about Alpha's out-of-state record painting bridges, she claimed that it was "not pertinent" to her analysis for DRPA's New Jersey and Pennsylvania bridges, although she conceded that it might be relevant to assessing Alpha's "safety." A.1782. She insisted that it was "not feasible" to even ask Alpha about its out-of-state record, A.1783, intimating only that her superior told her once not to contact bidders during her review. She also admitted to knowing that Alpha had previously performed work in Pennsylvania in 2014 as part of a joint venture.

Alpha's counsel also asked Staszewski whether, as a consequence of her EMF analysis, DRPA would only "approve" contractors that had previously performed work in New Jersey or Pennsylvania in the last three years. She said no. In fact, Staszewski admitted that it was "possible" that a new contractor that had never been assigned an EMF in Pennsylvania or New Jersey and had done no work there could be approved under her EMF policy, although she could

---

[9] *Alpha Painting & Constr. Co., Inc. v. Delaware River Port Auth.*, No. 116-CV-05141 (NLH)(AMD), 2016 WL 5339576, at *5 (D.N.J. Sept. 23, 2016).

15

not list, when asked, what other factors she might consider in so finding.

Staszewski disclosed that she did contact Alpha's insurance broker to confirm that Alpha had not performed any work in Pennsylvania or New Jersey. She did not contact Alpha directly. No one at DRPA did. To the contrary, because he had not heard from DRPA since being declared the lowest bidder, Kousis repeatedly called and emailed DRPA staff to inquire whether DRPA had sufficient information to complete its review. Most calls and emails were ignored. Kousis reached Jacurak once by phone sometime in July, but Jacurak did not mention that Alpha failed to submit its OSHA 300s.

Not much else exists in the record regarding DRPA's review of Alpha. Other portions of the bid were sent to other DRPA departments, but the status of their review is not known. DRPA's chief engineer, Michael Venuto testified that because Staszewski withheld her approval, he never contacted Alpha's references from other jobs, performed due diligence with respect to noise control, assessed compliance with Coast Guard requirements, or investigated Alpha's ability to provide under-deck staging.

With respect to Corcon, its bid was missing the requisite 2013 EMF—its broker letter provided usable EMFs for 2014 and 2014 only. Upon noticing its absence, Staszewski called Corcon's broker, who provided an updated insurance letter containing the missing 2013 EMF. Staszewski then concluded, after averaging Corcon's EMFs, that it "embrace[d] a safety culture." A.1756. She then approved its bid from a safety review perspective. It is not

16

clear from the record, what, if any, other responsibility investigation DRPA undertook with respect to Corcon.

## 4. DRPA's Modification of Corcon's Bid on August 9, 2016

Alpha also challenged DRPA's subsequent modification of Corcon's bid, which had the effect of making Corcon the lowest bidder. The IFB required bidders to propose a price for "Mobilization and Clean-up" costs, which, according to the IFB, was not to exceed 7.5% of the total bid price. A.361 ("Section Q"). Corcon's bid exceeded this 7.5% limitation. Jacurak testified that he noticed this on June 17, 2016, when he performed an initial review of the price schedules. However, he did not declare Corcon nonresponsive to the IFB.

Instead, on August 9, 2016, nearly two months after discovering the discrepancy (and about two weeks after Alpha filed its bid protest), DRPA sent letters to all bidders stating that DRPA had "discovered" that three bidders (one of whom was Corcon) "may have incorrectly computed the Mobilization and Clean-up line item." A.3820. It then cited IFB § A.7.5, which states in full:

> The Bidder shall state in the Form of Proposal the price per unit of measure or lump sum price, in words and in figures, for each scheduled item of Work, and the Total Price for the performance of the Work, as determined by

17

multiplying each estimated quantity by the price per unit of measure bid therefore and adding together the resulting amounts and any lump sum prices required. *For the purposes of comparison of Bids received, the Total Price, **correctly computed**, stated in the Proposal will be considered to be the amount Bid for the Work and the award will be made on that Total Price.*

A.81 (italic and bold emphasis added). Relying on the italicized portion, and in particular the bolded phrase, "correctly computed," DRPA asked each firm that bid more than 7.5% of its total bid price to "confirm" that the Mobilization costs quote "was, in fact, a miscalculation." A.3821. DRPA then declared Corcon the lowest responsible bidder. Finally, after approving Corcon's bid, DRPA's staff recommended Corcon to the Board of Commissioner's Operations and Maintenance Committee.

## B. Proceedings before DRPA's Board of Commissioners

Alpha protested the July 28 Rejection Letter on July 29, 2016 in a letter to DRPA, noting in particular that if DRPA's decision was based on responsiveness, it should have been made earlier and that DRPA "could have easily asked for the documents." A.421. DRPA's General Counsel denied a hearing and rejected the protest, although he permitted DRPA to file a written appeal to DRPA's Board of Commissioners.

The Operations and Maintenance Committee took up Alpha's appeal and the recommendation to accept Corcon's

18

bid at a special meeting dedicated solely to these matters on August 10, 2016. Alpha did not attend this meeting. The meeting began at 10:40 am and the Committee immediately moved into executive session. No transcript or minutes were taken. The Committee then went back on the record at 10:51 am, approved DRPA's recommendation to award the Phase 2 contract to Corcon without discussion, and adjourned at 10:54 am, three minutes later.

DRPA's full Board considered the Committee's resolution to accept Corcon's bid on August 17, 2016, at its regularly scheduled meeting. At the meeting, Alpha's counsel gave a lengthy and detailed statement outlining its protest. The Board then moved into executive session for 20 minutes, although, again, no minutes were taken. When it emerged, it resolved to accept Corcon's bid without acknowledging Alpha or hearing any public discussion of the Committee's resolution. It then directed DRPA's staff to enter negotiations with Corcon.

### C. Alpha's Federal Lawsuit

On August 23, 2016, Alpha filed suit in the District Court for the District of New Jersey on an expedited basis claiming that DRPA's award violated its guidelines and thus was arbitrary and capricious under New Jersey, Pennsylvania, and federal common law.[10] The complaint requested

---

[10] Alpha also claimed that DRPA's conduct violated its due process rights, the New Jersey Open Public Meetings Act, N.J. Stat. Ann. § 10:4-6, and the Pennsylvania Sunshine Act, 65 Pa. Cons. Stat. 701.

injunctive relief including an order directing DRPA to award the contract to Alpha.

The District Court held a four-day bench trial. In a lengthy opinion, the District Court separately considered and rejected both of DRPA's stated reasons—lack of OSHA 300 forms and lack of EMFs—although it focused on DRPA's EMF policy.[11] *Alpha Painting & Constr. Co., Inc. v. Delaware River Port Auth.*, No. 116-CV-05141 (NLH)(AMD), 2016 WL 5339576, at *3 (D.N.J. Sept. 23, 2016). It found DRPA's reliance on EMFs troubling. Because EMFs only accounted for workers' compensation injuries, it deemed them an underinclusive proxy for a bidder's safety record. It also found, based on the testimony of Alpha's insurance broker, that Alpha's failure to qualify for EMFs was not indicative of a poor safety record. Alpha's record was no different, in the District Court's view, from the hypothetical new contractor, who Staszewski said could be approved under her test. Thus, it ultimately concluded that "[n]othing in the record before [DRPA] prior to its final decision to characterize Alpha as non-responsible justified

---

[11] As noted, the parties disputed whether Alpha submitted the OSHA 300 forms. The District Court, however, declined to find one way or the other, characterizing the evidence as being in "equipoise" on that issue. *Alpha Painting*, 2016 WL 5339576, at *3. Nevertheless, the District Court found that the "OSHA 300 forms played no meaningful role . . . in DRPA's risk management and safety review." *Id.* at 5. Because we ultimately conclude that Staszewski failed to point to any evidence going to Alpha's inability to do the bridge work safely, OSHA forms included, we do not focus on this reason separately in our analysis.

that conclusion and nothing before [the District] Court support[ed] it either." *Id.* at \*8.

The District Court also rejected DRPA's claim that the agency had authority to modify Corcon's Mobilization and Clean-up cost quote. It concluded that DRPA did not have authority to make that change under IFB § A.7.5 and that DRPA's delay in exercising this alleged authority, despite being aware of the defect on June 17, 2016, suggested that the modification was a pretext to ensure that Corcon was awarded the contract.[12]

With respect to the remedy, the District Court found that irreparable harm would result if DRPA were not enjoined from proceeding on the contract with Corcon and reasoned that "there is no need to start the bidding process over, as such a remedy would be adverse to the public good, and

---

[12] The District Court also found that DRPA's review process was "[o]paque and [u]nreviewable." *Alpha Painting*, 2016 WL 5339576, at \*11. It was troubled by DRPA's counsel's "intimate[] involve[ment in] the bid review process," which resulted in DRPA claiming attorney client privilege "at every turn when . . . DRPA's employees were questioned about any decision-making." *Id.* at \*12. This, in the District Court's view, effectively prevented review of DRPA's decision.

The District Court declined to rule on Alpha's due process, Open Public Meetings Act, or Sunshine Act claims. *Id.* at \*15 n.34. Instead, it noted DRPA's lack of transparency "buttressed" its finding that DRPA acted arbitrarily and capriciously. *Id.* at \*15 n.33.

21

unfair to Alpha." *Id.* at \*15. To the contrary, it found Alpha was "fully capable and qualified to perform the work required under the contract, and [was] ready to mobilize immediately." *Id.* As support, it cited that Alpha's OSHA 300 forms showed Alpha had only one workers' compensation injury reported nationally over the last three years, while Corcon had seven on the Phase 1 project alone; that Alpha had been issued QP1 and QP2 certifications from the Society for Protective Coatings "which confirm[ed] that Alpha is capable of removing industrial hazardous paint," *id.* at \*8 n.21; and that Alpha has significant experience painting bridges. The District Court then entered an order "permanently enjoin[ing DRPA] from awarding Contract No. CB-31-2016 (Phase II) to any entity other than [Alpha], and [DRPA] shall award Contract CB-31-2016 (Phase II) to [Alpha]." A.13.

This expedited appeal followed.

## II. Analysis[13]

After a bench trial, as here, we review the District Court's factual findings, and mixed questions of law and fact, for clear error, and we review the Court's legal conclusions *de novo*. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282-83 (3d Cir. 2014) ("On appeal from a bench trial, our court reviews a district court's findings of fact for clear error and its conclusions of law *de novo*. For mixed questions of law and fact we apply the clearly erroneous standard except that the District Court's choice and interpretation of

---

[13] The District Court had jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction under 28 U.S.C. § 1291.

legal precepts remain subject to plenary review." (internal quotations and citations omitted)); *see also Free Speech Coal., Inc. v. Attn'y Gen.*, 825 F.3d 149, 159 (3d Cir. 2016); *In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 196 (3d Cir. 2013); *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991). We review an order granting injunctive relief under an abuse of discretion standard. *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 335 (3d Cir. 2016).

DRPA raises numerous challenges to the District Court's order, but we consider only three material to resolving its appeal.[14] DRPA claims (A) that the District Court abused its discretion by declaring that DRPA arbitrarily and capriciously rejected Alpha and selected Corcon; (B) that it was reversible error to fail to join Corcon, who DRPA claims was a necessary party under Fed. R. Civ. P. 19; and (C) that the District Court erred when it directed DRPA to

---

[14] Because the District Court declined to rule on Alpha's due process claim and other state law claims under the Open Meetings Act and Sunshine Act, we find it unnecessary to consider DRPA's arguments regarding these issues. DRPA also argues that the District Court's lengthy discussion about DRPA's repeated invocation of attorney-client privilege during trial amounted to an adverse inference that influenced its ultimate arbitrary and capricious ruling. *See supra*, note 12. We do not read the opinion this way. The District Court noted only that DRPA's use of privilege prevented the District Court from effectively reviewing DRPA's conduct. Regardless of whether DRPA claimed privilege, DRPA still had the burden to provide a rational basis for its action. As we conclude below, it failed to do so.

award the Phase 2 contract to Alpha. We consider each below.

## A. DRPA's Rejection of Alpha and Selection of Corcon

With respect to the first issue, DRPA maintains that it was not arbitrary and capricious (1) to label Alpha "not responsible" or (2) to modify Corcon's Mobilization line item. Both determinations had the effect of making Corcon the lowest, responsible bidder.

A District Court's review of an agency's procurement decision "is extremely limited in scope." *Princeton Combustion Research Labs., Inc. v. McCarthy*, 674 F.2d 1016, 1021 (3d Cir. 1982). Because such decisions implicate an agency's expertise, we must be careful not to "substitute [our] judgment for the agency's." *Id.* At the same time, we may not shirk our judicial duty to ensure that a government agency has complied with applicable bidding rules and regulations, which exist in part for the public's benefit by ensuring that the agency obtains the most advantagous contract available. Thus, a district court may not overturn a procurement decision "unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision." *Sea–Land Servs., Inc. v. Brown*, 600 F.2d 429, 434 (3d Cir. 1979); *see also R.A. Glancy & Sons, Inc. v. U.S. Dep't of Veterans Affairs*, 180 F.3d 553, 557 (3d Cir. 1999); *Coco Bros. Inc. v. Pierce*, 741 F.2d 675, 679 (3d Cir. 1984) (recoginzing that discretion to award injunctive relief in

procurement cases "is restricted to circumstances where the governmental agency's action is illegal or irrational").

However, if the agency provides a rational basis for its action, our inquiry comes to an end. *See Princeton Combustion*, 674 F.2d at 1022 (holding that, as a matter of law, where the procurement decision was rational, a reviewing court may not award injunctive relief despite the presence of procurdural irregularities in the procurement process).[15]

---

[15] The parties rely on our previous bidding dispute cases without addressing a crucial distinction present here: nearly all of those cases involve challenges to contract awards by federal agencies brought under the Administrative Procedures Act. DRPA, however, is a bi-state corporate instrumentality created under the Compact Clause of the U.S. Constitution. *See Allied Painting, Inc. v. Del. River Port Auth.*, No. CIV.A. 04-1032 (MAM), 2005 WL 724107, at *1 (E.D. Pa. Mar. 29, 2005) (recognizing that it is an open question whether DRPA is a federal agency governed by the APA or a state agency governed by state administrative law). For purposes of review in this diversity case, we do not think this distinction is material. *Compare* 5 U.S.C. § 706 (permitting federal courts to set aside agency action under the APA that is "arbitrary, capricious, [or] an abuse of discretion"), *with Textar Painting Corp. v. Del. River Port Auth.*, 600 A.2d 795, 799-800 (N.J. Super. Ct. Law. Div. 1996) (noting, in bid dispute case, that "the actions of . . . DRPA are reviewable by [the] court," and applying "arbitrary and unreasonable" standard).

Accordingly, we turn now to DRPA's arguments that it had a rational basis under its guidelines for its actions.

### 1. Alpha's Failure to Submit OSHA 300 Forms and EMFs

DRPA argues that it has a rational basis for labeling Alpha not responsible. We cannot see how. DRPA essentially faults the responsiveness of Alpha's bid package and relies exclusively on Alpha's failure to provide OSHA forms and EMFs. But DRPA did not label Alpha non-responsive. Instead, it rejected Alpha as "not responsible." We have closely scrutinized the record and have been unable to find *any* justification casting doubt on Alpha's "capability" or "capacity" to perform abrasive lead paint stripping and repainting.[16] Moreover, we do not think DRPA's guidelines

---

[16] Most of DRPA's arguments on appeal, in an apparent effort to distract us from this glaring deficiency in proof, are directed at the District Court's finding that DRPA's EMF policy was an underinclusive safety metric. DRPA argues that the District Court impermissibly substituted its personal judgment and opinion on this safety issue in violation of our standard. We think, however, that DRPA's arguments miss the mark. The real issue is whether DRPA had any evidence—as a result of its EMF policy or otherwise—to support its determination that Alpha was "not responsible," i.e., not capable. For the reasons herein, we think it did not.

allowed it to reject a bidder as not responsible based on this type of justification.[17]

We begin with Marianne Staszewski, as her testimony was a focus of the parties' briefing and DRPA's contentions at oral argument. She did not identify any facts that could support DRPA's responsibility finding. Staszewski simply did not approve Alpha because it had not supplied the bid safety information she was accustomed to receiving. That conclusion ultimately—and for reasons unknown— manifested as DRPA's affirmative finding that Alpha was "not responsible" in the July 28 Rejection Letter. DRPA maintains this was rational. However, we fail to see how Alpha's failure to "qualify" for EMFs permitted DRPA to conclude that Alpha was "not responsible." At least in terms of insurance risk, Alpha's EMF history made it no different from a new contractor who had never performed work in Pennsylvania or New Jersey—both would pay the same standard market rate of insurance.[18] Yet Staszewski said that she could *not* approve Alpha's record, but *could* "possibl[y]" approve a hypothetical new contractor without EMFs.

---

[17] Assuming, without deciding, that DRPA enjoys the same *Skidmore* deference afforded to administrative agencies when they interpret their own regulations, such deference would be minimal in this case given the lack of any binding effect outside DRPA, the lack of thoroughness in DRPA's consideration, and the lack of persuasive reasoning. *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 300 (3d Cir. 2012) (setting forth the factors that determine how much deference we owe to an agency's interpretation of its own regulations).

[18] DRPA has not challenged this finding as clearly erroneous.

27

A.1784. She offered no reasoned explanation why. Surely, the absence of EMFs in a bidder's record does not show "frequen[t] and sever[e] losses" on the job, which was Staszewski's central safety criterion. A.1747. An absence of EMFs shows nothing one way or the other, and therefore was not evidence of Alpha's inability to do the work safely.

What we find so puzzling is that DRPA was aware of at least some evidence from which it could evaluate Alpha's past safety performance. For example, Staszewski knew about Alpha's 2014 joint venture work on another project in Pennsylvania. The joint venture was assigned an EMF of .837, which fell well below Staszewski's 1.25 bright-line rule. She simply did not consider it. Moreover, DRPA maintains on appeal that it is "infeasible" to inquire into Alpha's out-of-state bridge painting experience, despite some evidence that most states subscribe to a national and uniform rating service. DRPA has not persuasively explained why this data was not at least relevant to assessing Alpha's safety culture.[19]

At most, Alpha's bid was "not responsive" under the guidelines. Its alleged failure to submit OSHA 300 forms and EMFs (or a suitable equivalent) failed to "conform" to § A.10.3's clear text. DRPA all but concedes this point, and essentially argues that it may also label a bidder "not

---

[19] DRPA's counsel urged at oral argument that it could accept only in state-bidders if it chose to do so. We are not persuaded. The bidding guidelines do not permit DRPA to narrow its field of potential contractors in this way, nor did DRPA discuss this at the pre-bid meeting, which many out-of-state bidders attended.

responsible" at any time in the procurement process for the same reason.

This line of argument, however, conflicts with DRPA's own guidelines. The guidelines establish that responsiveness and responsibility are mutually exclusive inquiries. DRPA had ten days from bid submission to declare Alpha non-responsive to the IFB. It did not elect to do so here (nor do we think it could have done so on July 28, thirty-two days after this ten-day window closed). DRPA instead labeled Alpha "not *responsible*." This designation triggered a different set of obligations and standards under the guidelines. DRPA had an affirmative duty to determine the lowest bidder's responsibility, and could only reject its bid and select a higher bid if its investigation unearthed a "substantial reason" why the bidder was not "capable" or did not have the "capacity" to do the work. A.524. Indeed, the guidelines specifically contemplate that DRPA might have to look outside the four corners of the lowest bidder's submission to fulfil that duty, including "requesting further clarification from the bidder[] as appropriate." A.526.

Here, for reasons that still elude us, DRPA appears to have simply given up once it determined that Alpha's EMF record was inconclusive. DRPA did not contact Alpha to "request[] further clarification." A.526. Jacurak, DRPA's senior project engineer who knew about Alpha's paperwork deficiencies, did not ask Kousis, Alpha's project manager, about them during their call.[20] DRPA also failed to perform

---

[20] Jacurak and Staszewski cited DRPA's practice of not contacting bidders during their review, which DRPA's counsel emphasized to us at oral argument. We understand

29

many other responsibility inquiries, as DRPA's chief engineer Venuto noted, such as contacting Alpha's references. No public searches were done; no news searches; no certification assessments. Certainly nothing in the guidelines prohibited these sorts of inquiries. Rather, they are encouraged, if not mandated. In short, DRPA appears to have actually gone out of its way to avoid relevant safety history information with respect to Alpha.

There is yet another problem with DRPA's argument. Even if we were to agree with DRPA that it could designate a bidder as "not responsible" because the bidder's safety record was unknowable from the four corners of its submission, DRPA does not seem to have applied that rule consistently in this case. Corcon failed to submit three years of EMFs (providing only two usable years—2015 and 2014). DRPA should have rejected Corcon for the same reason. We therefore agree with the District Court that DRPA's application of its rules in this case gave unequal treatment to Alpha and Corcon. *Cf. Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs.*, 747 F.3d 172, 179–80 (3d Cir. 2014) (quoting *Muwekma Ohlone Tribe v. Salazar,* 708 F.3d 209, 216 (D.C. Cir. 2013)) ("Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently.").

DRPA's desire to maintain the appearance of impartiality, but, as Jacurak noted in his testimony, there is no provision in the guidelines prohibiting contact with a bidder. To the contrary, the provisions we note *supra* counsel DRPA to do exactly the opposite.

In sum, neither Staszewski nor any other employee or document proffered a rational basis—pursuant to DRPA's 1.25-or-lower EMF policy or otherwise—for labeling Alpha "not responsible." DRPA's testimony in fact revealed that no one knew who ultimately translated Staszewski's conclusion that Alpha's record contained insufficient materials to assess responsibility into the July 28 Rejection Letter, which affirmatively determined that Alpha was not responsible. We find that the District Court was correct in concluding that DRPA acted irrationally.

## 2. DRPA's Modification of Corcon's Mobilization and Clean-up Cost Price

DRPA next challenges the District Court's finding that DRPA acted without authority when it subsequently limited Corcon's Mobilization and Clean Up line item. Jacurak recognized on June 17, 2016 that, contrary to what the IFB required, Corcon had bid more than 7.5% of its total bid price for this line item. Although DRPA characterized this as a computation error within the meaning of IFB § A.7.5, DRPA did not move to "correct" the alleged miscalculation until two months after learning about it, and only until after Alpha had filed a bid protest. The District Court concluded that DRPA's "discovery" was merely a pretext to ensure that Corcon was awarded the contract. On appeal, DRPA does not try to explain away the suggestive timing of this revision. Instead, it contends that Section Q and § A.7.5 of the IFB "expressly permit[]" it to reduce Corcon's bid so that it complies with the IFB. DRPA Br. 41.

This argument, however, borders on the frivolous. Section Q, which defines how DRPA will pay its contractor for each unit of work performed, says nothing about DRPA's

31

power to *modify* a bidder's final quote during its subsequent investigation. Section A.7.5, which is titled "Preparing Proposals," is similarly unavailing because it merely instructs contractors how to add or multiply their bid prices. In this context, the phrase "correctly computed" can only plausibly refer to a limited authority to correct mathematical errors in the *contractor's computations* of his Total Bid Price. A.81. The following section, § A.7.6, actually explains this. *See* A.82 ("If, during the tabulation of Bids, the Total Price on any Proposal is found to be *incorrectly computed*, [DRPA] reserves the right to make such changes as are necessary in the extended Amounts and Total Price, on the basis of the unit and lump sum prices given in words and the approximate quantities stated for the scheduled items therein." (emphasis added)). Moreover, much like DRPA's responsibility determination, the decision to modify Corcon's bid appeared out of thin air. There is nothing in the IFB or otherwise that gives DRPA such expansive authority. The District Court correctly concluded that DRPA lacked the authority to modify Corcon's bid. On August 9, 2016, Alpha was still the lowest bidder.

* * *

In sum, we agree with the District Court that DRPA's conduct over this two-month period, taken together, suggests that it has gone out of its way to award the Phase 2 contract to Corcon and not Alpha. We are equally alarmed that DRPA's Board of Commissioners gave virtually no attention to Alpha's protest. And, after months of litigation, much still remains unclear. What is clear, however, is that DRPA's actions defy reasonable explanation. Accordingly, we hold that DRPA's rejection of Alpha and its eventual award to Corcon was "illegal [and] irrational," *Coco Bros.*, 741 F.2d at

32

679, and that the District Court's order setting it aside was not an abuse of discretion.

### B. Corcon as a necessary party under Rule 19[21]

Next, DRPA urges that we vacate the District Court's order because Corcon, who was not joined in this action, was a necessary party under Federal Rule of Civil Procedure 19(a)(1)(B)(i). This rule provides that a party must be joined if the party has "an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). We fail to see, however, how Corcon had a protectable interest relating to this dispute that would have necessitated its joinder.

DRPA relies on *Independent Enterprises Inc. v. Pittsburgh Water & Sewer Authority*, wherein we rejected a disappointed bidder's procedural due process claim. 103 F.3d 1165, 1178 (3d Cir. 1997). Because the bidder's bid had

---

[21] We undertake plenary review of a District Court's ruling under Rule 19 that an absent party's rights were not necessary. *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). We may reach this issue on appeal, even if it was not raised in the district court. *Disabled in Action v. Se. Penn. Transp. Auth.*, 635 F.3d 87, 97 (3d Cir. 2011).

33

never been accepted by the state authority, we held that it "had no legally enforceable interest in receiving the contracts." *Id.* at 1179. In so finding, we said that "one who bids on a public contract has no legitimate expectation of receiving it until the contract is *actually awarded*." *Id.* (emphasis added) (citing *Highway Express Lines v. Winter*, 200 A.2d 300, 303 (Pa. 1964)). DRPA seizes on this distinction between bidder and awardee to argue that because Corcon was "awarded" the contract, it obtained an enforceable property right.

We disagree. We had no occasion in *Independent Enterprises* to explore, much less decide for Rule 19 purposes, what it meant to "actually award[]" a contract. *Id.* Whatever that threshold may require, we think it clear that DRPA's guidelines do not vest any property right in a DRPA awardee. DRPA's Board's resolution merely "authorize[ed] [DRPA's] staff to negotiate a construction contract with . . . Corcon." Supp. App. A.5. It did not create any contract rights. Moreover, the guidelines accord significant discretion to DRPA to negotiate with and even reject the eventual awardee specified in that resolution. For example, DRPA may seek to negotiate discounts with the awardee, *see* A.495, or may even reject the awardee as not responsible "later in the process and *until the contract is fully executed*," A.524 (emphasis added). DRPA has not "fully executed" a contract with Corcon and thus it had no protectable property right. *Cf. Coco Bros.*, 741 F.2d at 677 (recognizing that "negotiations after initial acceptance of a bid postponed the date of the 'final award'").

Even if it did have a property right, Alpha persuasively points out that Corcon's interests were fully represented by DRPA, which zealously sought to uphold its designation of

Corcon as the lowest responsible bidder. *See Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1191 (3d Cir. 1979) ("The fact that the absent person may be affected by the judgment does not of itself require his joinder if his interests are fully represented by parties present.").

We note, too, that DRPA's own representations in this case tend to undermine its claim that Corcon has a right to the Phase 2 contract. During trial, DRPA represented to the District Court that it would not award the contract until the litigation had been resolved. Moreover, during the pendency of this appeal, DRPA sent at least two letters to bidders requesting that they agree to "an extension of the date of award." Supp. App. A1, A3. We decline to vacate the order on this ground.

## C. Remedy

Finally, we must decide whether the District Court erred when it directed DRPA to award the Phase 2 contract to Alpha. Because we conclude that the District Court exceeded its authority by deeming Alpha "responsible" under DRPA's guidelines, we will vacate the portion of the order directing the contract award and remand for the entry of a more limited injunction.

We have said that even when a disappointed bidder has shown an agency procurement decision to be irrational or illegal, "prudent judicial discretion may still refuse declaratory or injunctive relief because of overriding public interests." *Sea-Land Servs.*, 600 F.2d at 434. This is because "[j]udicial intrusion into government purchases necessarily delays completion of the contract and increases costs, with

35

little measurable benefit to the public." *Allis-Chalmers Corp., Hydro-Turbine Div. v. Friedkin*, 635 F.2d 248, 252-53 (3d Cir. 1980). Thus to determine whether injunctive relief should be granted, district courts should weigh (1) the practical considerations of efficient procurement of supplies for continuing government operations, (2) the public interest in avoiding excessive costs, and (3) the bidder's entitlement to fair treatment through adherence to statutes and regulations. *Sea-Land*, 600 F.2d at 434.

This case implicates a subsequent question in the remedy analysis: what is the appropriate scope of injunctive relief. The District Court directed DRPA to award the contract to Alpha. Although *Sea-Land* does not preclude this coercive form of relief, we have been clear that a district court "must not succumb to the temptation of substituting its judgment" for that of the agency's procurement expertise. *Id.* at 435; *see also Princeton Combustion*, 674 F.2d at 1021 ("The district court is not to substitute its judgment for the agency's . . . ."). This is especially true where, as here, the agency is charged with determining whether a contractor is safe, responsible, and capable of performing a highly specialized and potentially hazardous construction project. Depending on the posture of the procurement, directing an agency to award a contract to a specific bidder has the high potential of transgressing this limitation. Accordingly, district courts should not direct an agency to award a contract to a specific bidder "unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984); *Cf. Choctaw Mfg. Co. v. United States*, 761 F.2d 609, 620 (11th Cir. 1985).

36

Here, the District Court weighed the *Sea-Land* factors and concluded, relevant to the first factor, that there was no need to "start the bidding process over, [which] would be adverse to the public good" and, relevant to the third, that irreparable harm to Alpha would result if DRPA was not enjoined from proceeding. *Alpha Painting*, 2016 WL 5339576, at *15. We agree, and note in addition only that the second factor in this case is largely neutral given the relatively small gap between both Alpha's and Corcon's bid price. The *Sea-Land* factors, therefore, favor injunctive relief.

However, we also agree with DRPA that the District Court abused its discretion by directing the agency to award the contract to Alpha because it is not clear that Alpha would have received the contract "but for" DRPA's illegal conduct. We can sympathize with the District Court's sentiment that Alpha appeared perfectly qualified to perform abrasive blast cleaning and painting. It possessed QP1 and QP2 certifications from a recognized trade association and significant bridge painting experience. Alpha also seemed to be a safe contractor as its OSHA 300 forms show only one incident over three years.

But DRPA never determined that Alpha was "responsible" with respect to safety, capability, or otherwise. In fact, there is clear testimony in the record that the July 28 Rejection Letter effectively ended any further review of Alpha's file. DRPA's chief engineer noted that, as a result of that letter, DRPA never bothered to contact Alpha's references from other jobs, never performed due diligence with respect to noise control, and never assessed compliance with respect to Coast Guard requirements or Alpha's ability

37

to provide under-deck staging. We simply cannot be certain what those inquires might reveal or how DRPA's engineering team might weigh them. We therefore do not know whether, but for the July 28 Rejection Letter, Alpha would have received the contract. Because DRPA never completed its responsibility investigation, the District Court's factual finding that Alpha was "responsible" was an impermissible "substitut[ion] [of] judgment." *Sea-Land*, 600 F.2d at 435. The directed contract award, therefore, was an abuse of discretion.

Alpha responds by citing *Ulstein Maritime Ltd. v. United States,* 833 F.2d 1052 (1st Cir. 1987), as support for the District Court's directed award. There, the court concluded that "but for" the violations of the applicable guidelines, "one of the other bidders" would have received the award. *Id.* at 1058 (citing *Delta Data Sys.*, 744 F.2d at 204). But, unlike here, the court did not award the contract to "any specific plaintiff." *Id.* Instead, it ordered the Navy to "review the bids previously received and to award the contract to the next low, responsive and responsible bidder" because it was "possible," upon remand, that "[the plaintiffs] may be rejected for defects in . . . responsibility, leading to the award of the contract to a higher bidder or to no bidder at all." *Id.* Thus the order in *Ulstein*, far from lending support for the directed award here, "merely un[did] the illegal agency actions and instruct[ed] the agency to proceed with the procurement which [was] in progress." *Id.*

Therefore, we think *Ulstein* actually counsels in favor of a more limited injunction, the goal of which, in the circumstances of this case, should be to undo the illegal action and return Alpha to competition. *See Delta Data Sys.*,

38

744 F.2d at 206–07 ("[T]he main objective of our effort at framing a [bidding violation] remedy is to assure that the government obtains the most advantageous contracts by complying with the procedures . . . . Putting the disappointed bidder in the economic position it would have occupied but for the error is normally the best approach to this result."); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013) (ordering agency to restore apparent-low-bidder to competition for contract and requiring agency to "reevaluate [the] proposals"); *Beta Analytics Int'l, Inc. v. United States*, 75 Fed. Cl. 155, 159 (2007) ("A reevaluation restores to a victim of arbitrary and capricious procurement activity its substantial chance to receive the contract award.").

Here, DRPA arbitrarily removed Alpha from contention for the Phase 2 contract. Accordingly, Alpha should be restored to competition and DRPA should evaluate Alpha's bid and affirmatively determine, per its guidelines, whether Alpha, the lowest bidder, is a "responsible" contractor. We therefore will vacate the portion of the District Court's order directing DRPA to award CB-31-2016 to Alpha and remand to the District Court for it to fashion a more limited injunction consistent with this opinion.

### III. Conclusion

For the foregoing reasons, we affirm in part, vacate in part, and remand to the District Court.